680 A.2d 1067

Kenneth GOODWICH,

v.

SINAI HOSPITAL OF BALTIMORE, INC.

No. 66, Sept. Term 1995.

Court of Appeals of Maryland.

Aug. 6, 1996.

**186**

Angus R. Everton (Roy L. Mason, Diane S. Deros, Susan Marie Reiners, Mason, Ketterman & Morgan, on brief), Baltimore, for petitioner.

Michael J. Baxter (John R. Penhallegon, David J. McManus, Jr., Smith, Somerville & Case, L.L.C., on brief), Baltimore, for respondent.

Jerome G. Geraghty, Francine R. Strauss, Blades & Rosenfeld, P.A., Baltimore, for amicus curiae The Maryland Hosp. Ass'n, Inc.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

BELL, Judge.

This case presents for our review the issue of whether summary judgment was properly granted in favor of the respondent, Sinai Hospital of Baltimore, Inc. ("Sinai"), based upon the immunity provided by the Health Care Quality Improvement Act of 1986 ("HCQIA" or "the Act"), 42 U.S.C. §§ 11101–11152 (1994). The petitioner, Kenneth Goodwich ("Dr. Goodwich"), sued Sinai in the Circuit Court for Baltimore City because it restricted his privileges to practice medicine in the hospital. The court granted Sinai's motion for summary judgment on the ground that it was statutorily immune from suit. On appeal, the Court of Special Appeals affirmed the judgment of the circuit court. *Goodwich v. Sinai Hospital,* 103 Md.App. 341, 653 A.2d 541 (1995). At the petitioner's request, we issued the writ of certiorari. We shall affirm the judgment of the Court of Special Appeals.

## I.

The professional relationship between Dr. Goodwich and Sinai, which is at the heart of this appeal, began in 1974, when Dr. Goodwich interned at the hospital. From 1975 to 1978, he served as a resident in the Obstetrics and Gynecology Department. Upon completion of his residency, Dr. Goodwich joined the hospital staff as an assistant attending physician.

On June 29, 1988, after several years of discussion and correspondence with Dr. Goodwich regarding patient care

issues,[1] Dr. Phillip Goldstein, the Chairman of the Obstetrics and Gynecology Department, sent Dr. Goodwich a letter, noting yet another patient care issue and suggesting that "in the litigious atmosphere of 1988" it would be prudent for him to obtain second opinions from board certified obstetricians and gynecologists ("OB–GYNs") for all "high risk [obstetrical] patients."[2] Dr. Goodwich agreed with Dr. Goldstein's recommendation and so informed him by a letter dated August 12, 1988.

---

1. The first letter from Dr. Goldstein addressing patient care issues in Dr. Goodwich's credentialing file is dated July 15, 1980. In that letter, Dr. Goldstein expressed concern about a cesarean section delivery Dr. Goodwich performed on a 14–year–old girl, whose labor pattern appeared to be normal. In a letter dated September 29, 1980, Dr. Goldstein raised concern over Dr. Goodwich's refusal to see a patient because he had terminated his contract with her referral center. The patient suffered a seizure and therefore "essentially had no attending supervision in her immediate post convulsive state." Dr. Goodwich's administration of the drug Pitocin to a patient to stimulate labor without using an electronic monitor to evaluate her contractions and their effect on the fetal heart rate was questioned in a letter dated October 26, 1982. In that letter, Dr. Goldstein stated, "[t]he use of a dangerous drug in the absence of adequate surveillance suggests a degree of negligence not acceptable to me or to this institution." Dr. Goldstein's letter dated August 8, 1984 concerned a patient admitted for a second trimester abortion in which Dr. Goodwich performed a laparoscopy for a possible ectopic pregnancy, without having performed a sonogram. Stating that he considered such behavior "a profound violation of the standard of care," in a letter dated June 19, 1987, Dr. Goldstein addressed the issue of a discharged patient who had to be readmitted for an infection after Dr. Goodwich failed to give her prophylactic antibiotics despite her history of rheumatic fever.

2. The June 29, 1988 letter stated, in relevant part:

 A recent survey of the physician activities here at Sinai Hospital identified the fact that you have not as yet passed your boards. As you know it isn't mandatory to pass your boards for membership in the Sinai Medical Staff. On the other hand, I also recently noticed a pre-eclamptic* admitted to the obstetrical service, with no senior consultation. It would seem prudent that for any of the high-risk patients, in the litigious atmosphere of 1988, that such a consult note would be useful. I am not suggesting that I be the individual to act as a consultant in such high-risk obstetrical patients. On the other hand, it makes sense for you to select a board certified obstetrician

Over time, however, Dr. Goodwich failed to obtain second opinions as he had agreed to do. Thus, in a letter dated January 22, 1990, Dr. Goldstein wrote to Dr. Goodwich advising him of his failure to abide by his second opinion agreement. He also addressed three issues involving patient care. The letter concluded by advising Dr. Goodwich that a written second opinion by a board certified OB–GYN for all patients who were "high risk by the criteria of Calvin Hobel"[3] was required to be obtained and that, unless Dr. Goodwich complied voluntarily, Dr Goldstein would "present [a] recommendation for abridgement of [Dr. Goodwich's] privileges to the Medical Executive Committee on May 1, 1990." This prompted a February 1990 meeting between Dr. Goldstein and Dr. Goodwich's attorney. In that meeting it was agreed that Dr. Goldstein would not seek abridgement of Dr. Goodwich's privileges, provided that Dr. Goodwich obtained second opinions on all of his high risk patients. This agreement was memorialized in a letter dated February 26, 1990 from Dr. Goodwich's attorney to Dr. Goldstein.

Nevertheless, Dr. Goodwich's violation of the second opinion agreement continued, as did the instances in which his patient care was questioned.[4] Consequently, Dr. Goldstein asked the Director of Quality, Risk & Utilization Management at Sinai to examine Dr. Goodwich's compliance with the second opinion

---

and gynecologist to support your therapeutic goal in the management of such patients.

[*] Pre-eclampsia is a serious disease of late pregnancy. The symptoms include hypertension, protein in the urine, and fluid retention that causes the face and hands to become puffy. David E. Larson, *Mayo Clinic Family Health Book*, 1990.

3. Dr. Calvin J. Hobel, along with other medical researchers, developed a methodology to predict poor neonatal outcomes during the prenatal period based on an analysis of various prenatal and intrapartum factors. *See* Calvin J. Hobel et al., *Prenatal and Intrapartum High-risk Screening*, 117 Am. J. Obstetrics & Gynecology 1 (1973).

4. In a letter from the Quality Assurance Department dated November 5, 1990, Dr. Goldstein was advised that for the third quarter of 1990, "Dr. Goodwich performed nine C-sections. A second opinion was absent in each case." In a letter to Dr. Goodwich, dated March 15, 1991, Dr. Goldstein raised concern over an emergency cesarean section Dr. Goodwich performed in which he first attempted to induce a vaginal delivery by "push[ing] the cervix over the [baby's] head." Dr. Goldstein characterized this maneuver as "a remarkable deviation from the standard of care...."

requirement. That information, provided to Dr. Goldstein on December 2, 1991, revealed Dr. Goodwich's failure to obtain second opinions for several high risk patients. It also revealed additional problems with Dr. Goodwich's patient management methods.[5] Dr. Goldstein, therefore, met with Dr. Goodwich to discuss these issues. Once again, Dr. Goodwich agreed to obtain second opinions in high risk obstetrical cases. Dr. Goldstein confirmed the agreement in an April 23, 1992 letter to Dr. Goodwich. In the letter, Dr. Goldstein also reemphasized that the required second opinion had to be in writing and posted in the patient's chart prior to surgery.

In June 1992, Dr. W. Scott Taylor, who was then acting Chief of the Obstetrics and Gynecology Department, Dr. Goldstein having left Sinai to accept a position at another hospital, wrote to Dr. Goodwich concerning two patient care issues.[6] In December 1992, Dr. Taylor asked Sinai's Director of Quality, Risk & Utilization Management, once again, to review Dr. Goodwich's compliance with the second opinion requirement.

Responding to Dr. Taylor's request, the Quality Assurance Committee, on January 27, 1993, reported to Dr. John L. Currie, who had earlier been appointed Chief of the Obstetrics and Gynecology Department, that since April 1992, the date when the second opinion agreement was reaffirmed for the third time, Dr. Goodwich had not obtained second opinions in 8 obstetrical cases. On January 28, Dr. Currie met with Dr. Goodwich to discuss this matter. At that time, Dr. Goodwich

---

5. According to Sinai, in the report by the Quality, Risk & Utilization Management staff on Dr. Goodwich, there were "56 cases, of which 25 did not contain second opinions, six involved delivery complications, eleven involved maternal infectious complications, and two involved failure to obtain required consents from patients."

6. Dr. Taylor expressed concern about a delivery Dr. Goodwich performed, in which he was absent from the labor and delivery suite during the time, purportedly an hour before the delivery, when the fetal monitor depicted fetal distress. Dr. Taylor also addressed, in the letter, a second incident involving an emergency cesarean section in which Dr. Goodwich apparently was not in the labor and delivery suite after being notified of fetal distress.

again agreed to obtain second opinions in high risk obstetrical cases. On that same date, Dr. Currie sent Dr. Goodwich a letter confirming the latest agreement and advising him that his privileges had been extended to March 31, 1993, but that renewal was dependent upon his obtaining written second opinions and direct supervision by board certified OB–GYNs for certain obstetrical and gynecological procedures.[7] Dr. Currie also advised Dr. Goodwich that his failure to obtain the second opinions for those specified procedures would result in further action against his privileges. Although he was requested to acknowledge his agreement with its contents by signing the letter, Dr. Goodwich declined to do so. On February 2, however, Dr. Goodwich and his attorney met with Dr. Currie, at which time Dr. Goodwich verbally agreed to the second opinion requirement.

When subsequently faced with yet another failure by Dr. Goodwich to obtain a second opinion, as well as further patient care concerns,[8] Sinai, consistent with the January 28 letter, responded by temporarily abridging his privileges. This abridgement was memorialized in a letter from Dr. Currie to Dr. Goodwich dated February 26, 1993. In the letter, Dr. Currie informed Dr. Goodwich that this action was taken pursuant to Article IV, § 7C of the By–Laws, Rules and

---

**7.** The letter enumerated the OB–GYN procedures for which Dr. Goodwich was required to obtain second opinions:

*Obstetrical:* Operative vaginal deliveries (i.e. forceps, vacuum extraction)
Management of fetal distress
Cesarean deliveries
Breech deliveries
Disorders of pregnancy such as pre-eclampsia, etc.
*Gynecological:* All major abdominal procedures
Vaginal hysterectomy
Laparoscopy (i.e., when any surgical procedure other than visual diagnosis occurs)

**8.** In a letter dated February 18, 1993, Dr. Taylor wrote to Dr. Goodwich regarding two patients that developed hyperstimulation syndrome after the use of prostaglandin gel. Also, according to Dr. Currie's testimony, given at the hearing held on April 30, 1993, Dr. Goodwich performed an abdominal hysterectomy on February 17, 1993 without obtaining a second opinion.

Regulations of the Medical Staff of Sinai Hospital.[9] The letter also informed Dr. Goodwich that the Medical Executive Committee ("MEC") would consider permanent abridgement of his privileges on March 8. It also provided him with the time and location of the meeting and advised him of his right to attend.

Prior to the MEC meeting, Dr. Goodwich's counsel was provided with a list of the specific cases under consideration and, in addition, the hospital's medical records for each patient were made available for his inspection. During the meeting, at which Dr. Goodwich, represented by counsel, was present, Dr. Currie discussed the proposed abridgement with the Committee members and the reasons for it. After allowing Dr. Goodwich to make a statement and to respond to questions from its members, the MEC voted to abridge Dr. Goodwich's privileges for a period of three months, beginning March 8, 1993, on the same terms and conditions as the prior temporary abridgement.[10] The change in Dr. Goodwich's privileges was reported to the Maryland State Board of Physician Quality Assurance and the National Practitioner Data Bank.[11]

After the meeting, Dr. Goodwich requested, and received, before a panel of three physicians, an evidentiary hearing to consider the reasonableness of the MEC's decision. He subsequently requested, and received, an administrative hearing before another three-physician panel. Both panels affirmed

---

**9.** Article IV, § 7C provides, in pertinent part:

6. In instances where, in the opinion of the Chief, the Chairman of the Medical Executive Committee, and the Chief Executive Officer of the Hospital, the welfare of a patient may be seriously affected absent abridgement of a member's privileges, the privileges of a member may be temporarily abridged until permanent procedures can be concluded. Before temporary abridgement may be imposed, the member must be advised in writing of the reasons therefor, and that permanent abridgement of his privileges will be considered by the Medical Executive Committee at a meeting to be held within fourteen (14) days after the notice.

**10.** The record reflects that before rendering its decision, the MEC deliberated for approximately one hour and a half.

**11.** *See* Maryland Code (1981, 1994 Repl.Vol., 1995 Cum.Supp.), Health Occ. Art. § 14–413(e); 45 C.F.R. § 60 (1995).

the decision of the MEC, as did Sinai's Board of Trustees at a subsequent meeting.

Within four days after and based upon the March 8 abridgement, Dr. Goodwich filed suit against Sinai and the MEC [12] in the Circuit Court for Baltimore City, alleging civil conspiracy, denial of procedural due process, breach of contract, intentional interference with contractual relations, and tortious interference with prospective economic benefit. On May 12, 1993, by stipulation of dismissal, the MEC was dismissed from the suit as were the civil conspiracy and due process counts. On January 17, 1994, Sinai filed a motion for summary judgment as to all remaining counts, claiming immunity under the HCQIA and state law. The hospital attached to the motion its correspondence with Dr. Goodwich over the years, hearing transcripts, as well as various other exhibits, including Supplemental Exhibit 25, which it identified as his credentialing file. After a hearing on the matter, the motion was granted. [13]

---

12. Dr. Goodwich did not sue any of the physicians involved in this case in their individual capacities.

13. In ruling on the motion, the trial judge stated:

Counsel, I'm prepared to rule on this issue. . . . I will tell you, I have serious doubt as to whether or not summary judgment should not be granted for Sinai Hospital in this case because I don't believe that the standard is subjective. The case law that I've read, Maryland or federal, I do believe that the standard is objective and that you have not presented, even in the doctor's affidavit, anything that, any facts that go beyond innuendo, allegation or conspiracy, so to speak, as to bad faith in applying an objective standard to the actions of Sinai Hospital, which are documented by the record, as exists at this point.

I find as follows: I find that applying either the federal statute or the Maryland applicable statutes as to the subjective test, as to whether or not the conduct of the defendant, Sinai Hospital in this case, was unreasonable and/or as to whether or not the plaintiff,Dr. Goodwich, was denied procedural due process, that the answer to those questions is no.

And the record, as far as this Court is concerned, does not read as a genuine dispute as to a material fact on those issues, including immunity. The Court will sign an order this date that will grant defendant, Sinai Hospital, Incorporated's motion for summary judgment.

Dr. Goodwich appealed to the Court of Special Appeals. That court, as previously noted, affirmed the judgment of the circuit court. *Goodwich v. Sinai Hospital, supra,* 103 Md. App. at 355, 653 A.2d at 548. The intermediate appellate court concluded that the hospital acted reasonably as the HCQIA requires and, therefore, was entitled to the immunity it provides. It further held that, because Sinai was immune from damages under federal law, it was unnecessary to reach the question of state law immunity. As we have also already noted, we granted Dr. Goodwich's petition for the writ of certiorari.

## II.

### A.

Congress enacted the HCQIA in 1986 for the express purpose of " 'improv[ing] the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior.' " *Bryan v. Holmes Regional Medical Center,* 33 F.3d 1318, 1321 (11th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995) (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 2, *reprinted in* 1986 U.S.C.C.A.N. 6287, 6384). Moreover, Congress stated, in the text of the statute, that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State." 42 U.S.C. § 11101(1) (1994). It further stated that such problems "can be remedied through effective professional peer review." *Id.* § 11101(3).

Thus, in keeping with its stated objective, the HCQIA provides participants in peer review activities with qualified immunity from liability for monetary damages in suits brought by the physicians who were the subjects of these review

activities.[14] The Act provides immunity for medical peer review actions if four statutory elements exist:

> For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—
>
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a) (1994). Section 11112(a) further states:

> A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.

The term "professional review action" is defined in § 11151(9), which provides, in pertinent part:

> [A] 'professional review action' means an action or recommendation of a professional review body[15] which is taken or made in the conduct of professional review activity,

---

14. In accordance with 42 U.S.C. § 11111(a)(1), the immunity provided by the Act specifically applies to:
 (A) the professional review body,
 (B) any person acting as a member or staff to the body,
 (C) any person under a contract or other formal agreement with the body, and
 (D) any person who participates with or assists the body with respect to the action

15. Subsection (11) defines a "professional review body" as
 [A] health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity.

which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges,or membership in a professional society, of the physician.

The legislative history of § 11112(a) reveals that Congress intended that the test of the statute's reasonableness requirements be an objective one, rather than a subjective good faith standard. The House Report on that section states, in relevant part:

Initially, the Committee considered a 'goodfaith' standard for professional review actions. In response to concerns that 'goodfaith' might be misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action, the Committee changed to a more objective 'reasonable belief' standard. The Committee intends that *this test will be satisfied if the reviewers,* with the information available to them at the time of the professional review action, *would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.*

*Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir.1992) (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 10, *reprinted in* 1986 Code Cong. & Admin. News 6287, 6392–93) (emphasis added); *Bryan, supra,* 33 F.3d at 1323. It is also evident from the legislative history that Congress intended that defendants in suits involving peer review immunity issues be allowed to file motions to resolve those issues "as early as possible in the litigation process." *Id.* at 1332 (footnote omitted); "[The Committee intends that] 'these provisions allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible.'" *Id.* (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 12, *reprinted in* 1986 U.S.C.C.A.N. 6394).

## B.

Dr. Goodwich contends that Sinai failed to satisfy the standards in § 11112(a) of the HCQIA, relating to the reasonable-

ness of its belief that the March 8, 1993 professional review action [16] was taken in furtherance of quality health care and was warranted by the facts known to it.[17] He submits further that § 11112(a)'s placement of the burden of proof on the physician to "rebut[ ] by a preponderance of the evidence" that the review action was unreasonable based on one of the four statutory elements, in the summary judgment context, imposes on him an improper burden. As he sees it, a motion for summary judgment predicated on the immunity established by

---

**16.** Dr. Goodwich does not dispute Sinai's position that the March 8 abridgement was a "professional review action" as that term is statutorily defined.

**17.** Specifically, Dr. Goodwich challenges § 11112(a)(1), (a)(2) and (a)(4) of the HCQIA. He does not contend that Sinai failed to conform to the third element, § 11112(a)(3), the requirement of fair and adequate hearing procedures. Indeed, he could not in good faith do so. Section 11112(b) provides that a health care entity is considered to have met the adequate notice and hearing requirement of subsection (a)(3), with respect to a physician, if certain enumerated criteria are met. Those criteria include, in pertinent part:

**(1) Notice of proposed action**
The physician has been given notice stating—
(A)(i) that a professional review action has been proposed to be taken against the physician,
 (ii) reasons for the proposed action,
(B)(i) that the physician has the right to request a hearing on the proposed action,
 (ii) any time limit (of not less than 30 days) within which to request a hearing, and
(C) a summary of the rights in the hearing under paragraph (3).
**(2) Notice of hearing**
If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—
 (A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and
 (B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.
§ 11112(b)(1) and (b)(2).
 Section 11112(b)(3) further states that if a hearing is requested pursuant to § 11112(b)(1)(B), the hearing must be held, *inter alia,* before a panel of individuals appointed by the health care entity, who are not in direct economic competition with the physician involved. In addition, in the hearing, the physician has the right to representation by an attorney or other individual of the physician's choosing, the right to call, examine, and cross-examine witnesses, and to present relevant evidence.

the HCQIA should be reviewed in accordance with Maryland summary judgment procedure.

Simply put, Dr. Goodwich maintains that the burden he has to overcome on summary judgment is one of production, not one of persuasion. He thus concludes that, at the summary judgment stage of the trial, he must present sufficient evidence to allow an issue material to his case to go the jury, rather than meet the ultimate burden of proving that issue by a preponderance of the evidence. Indeed, Dr. Goodwich asserts that the trial judge needed only to determine whether, when viewed in the light most favorable to him, there was sufficient evidence on the basis of which reasonable jurors could differ regarding whether he satisfied his burden of persuasion. Moreover, he claims that the Court of Special Appeals erroneously viewed the evidence he presented based on the preponderance standard. *Goodwich, supra,* 103 Md. App. at 353, 653 A.2d at 546–47.

In Dr. Goodwich's view, he met his burden of production by providing sufficient evidence to support the factual inference that Sinai's purpose in abridging his privileges was to avoid litigation, not "in the reasonable belief that the action was in the furtherance of quality health care." Specifically, Dr. Goodwich notes two letters sent to him by Dr. Goldstein which, in the context of discussing second opinions for high risk patients, reference a concern about Dr. Goodwich's lack of board certification creating a potential liability exposure for the hospital.

He further maintains that he met his burden of production by providing sufficient evidence to support the factual inference that Sinai made no "reasonable effort to obtain the facts of the matter." In this regard, Dr. Goodwich submits that there was sufficient probative evidence that Drs. Taylor and Currie continued the second opinion requirement started by Dr. Goldstein "without any meaningful evaluation of his ability to provide patient care[,]" and, indeed, "deliberately refused to investigate the underlying facts."

In similar fashion, Dr. Goodwich contends that there was probative and admissible evidence that the MEC took action against him without any meaningful review of the patient care he provided and that the Hearing Committee simply "rubber-stamped" the MEC's decision. He concludes that Dr. Currie, the MEC, and the Hearing Committee could not have decided to abridge his privileges for reasons of "patient welfare" without having reviewed any patient charts. He also points to the testimony his expert witness, Dr. Theodore M. King, former Chief of the Obstetrics and Gynecology Department at The Johns Hopkins Hospital, gave at the April hearing, as evidence that he was not a threat to patient welfare.

Finally, Dr. Goodwich asserts that he met his burden of production by providing sufficient evidence to support the factual inference that Sinai's action was not taken "in the reasonable belief that [it] was warranted by the facts known." In this regard, he argues that there were material factual issues relative to whether there was "any *reasonable* concern for patient welfare on the part of the hospital administration and the successive chiefs of the OB–GYN department at Sinai when Dr. Goodwich's privileges were abridged." He concludes that "there was no *admissible* evidence that the second opinions were necessary or that there was any patient mismanagement." [18]

---

18. In this regard, Dr. Goodwich contends that Sinai's Supplemental Summary Judgment Exhibit 25, which chronicles the events leading up to the March 8 abridgement, is inadmissible` hearsay. Moreover, he maintains that both the trial court and the Court of Special Appeals improperly relied on this exhibit. *See Goodwich, supra,* 103 Md.App. at 352, 653 A.2d at 546.

Sinai offers several responses to Dr. Goodwich's charge that Supplemental Exhibit 25 is inadmissible hearsay. First, it asserts that this file is not hearsay because it was not offered for the truth of the matter asserted, but rather to show that there was a reasonable basis for the abridgement of his privileges. Second, it asserts that, assuming *arguendo*, it is hearsay, Exhibit 25 falls under the business records exception. *See* Maryland Evidence Rule 5–803(b)(6). Sinai also argues that the full contents of the exhibit were discussed with Dr. Goodwich when it examined him under oath at the administrative hearing. Finally, it points out that, when transcripts of the hearing were offered as summary judgment exhibits at trial, Dr. Goodwich did not object to them.

Dr. Goodwich claims that "[i]n many of the patient cases identified by Sinai as supporting the abridgement of privileges, second opinions were in fact part of the file." He further maintains that the hospital made no effort to discover the facts underlying the absence of a written second opinion in the remaining patient cases to determine if patient welfare was jeopardized, and that the Hearing Committee neither asked for nor heard evidence to establish that he had deviated from accepted standards of care in any specific case.

As his last contention, Dr. Goodwich asserts that Sinai, in addition to lack of entitlement to federal immunity, also is not entitled to immunity under the provisions of Health Occupations Article of the Maryland Code (1981, 1994 Repl.Vol., 1995 Cum.Supp.), §§ 14–501(f) and 14–504(c).[19] This is so, he maintains, because his evidence regarding bad faith on Sinai's part, specifically that of Dr. Goldstein, would be relevant to state immunity, thereby preventing the entry of summary judg-

We need not address this issue. As we noted at oral argument, Dr. Goodwich failed to raise this issue in his certiorari petition. *See* Maryland Rule 8–131(b).

**19.** Section 14–501(f) of the Health Occupations Article provides:

A person shall have the immunity from liability described under § 5–393 of the Courts and Judicial Proceedings Article for any action as a member of the medical review committee or for giving information to, participating in, or contributing to the function of the medical review committee.

Section 14–504(c) of the Health Occupations Article provides:

A person described in subsection (b) of this section shall have the immunity from liability described under § 5–394 of the Courts and Judicial Proceedings Article for giving information to any hospital, hospital medical staff, related institution, or other health care facility, alternative health system, professional society, medical school, or professional licensing board.

Section 5–393(b) of the Courts and Judicial Proceedings Article provides:

A person who acts in good faith and within the scope of the jurisdiction of a medical review committee is not civilly liable for any action as a member of the medical review committee or for giving information to,participating in, or contributing to the function of the medical review committee.

ment.[20]

## C.

Not unexpectedly, Sinai views matters quite differently. It contends that, as a defendant seeking HCQIA immunity in a summary judgment context, it need only show that its actions fall within the statutory definition of a "professional review action" under 42 U.S.C. § 11151(9). Having made the requisite showing, Sinai claims that it qualifies for the presumptive immunity afforded by the HCQIA. Therefore, it disputes Dr. Goodwich's contention that it has the burden, at the summary judgment stage, of producing evidence demonstrating the reasonableness of its actions. On the contrary, it claims that upon showing that the March 8 abridgement was a peer review action, the four immunity elements in § 11112(a) are presumed to exist, and it is Dr. Goodwich who, in order to survive summary judgment, must rebut the statutory presumption by a preponderance of the evidence.[21]

Sinai maintains that it temporarily abridged Dr. Goodwich's privileges because he repeatedly failed to obtain second opinions that were reasonably necessary for it to insure quality patient care. It further maintains that the abridgement process represented a reasonable effort to consider all relevant facts, complied with all applicable hospital Medical Staff By-Laws, and afforded Dr. Goodwich an opportunity to participate and present any information he desired.

---

**20.** According to Dr. Goodwich, his relationship with Dr. Goldstein had long been fraught with animosity, which ultimately contributed to Dr. Goldstein's institution of the second opinion requirement. Thus, in his brief submitted to this Court, Dr. Goodwich asserts that Dr. Goldstein instituted the second opinion requirement, in part, because of "personal feelings toward Dr. Goodwich." We find it interesting, however, that in the February 26, 1990 letter to Dr. Goldstein, Dr. Goodwich's attorney commented that Dr. Goldstein had "no ... personal adverse interest to Dr. Goodwich."

**21.** The Maryland Hospital Association, Inc. filed a brief, as amicus curiae, in which it also argues that it is Dr. Goodwich who has the burden, on summary judgment, to rebut the statutory presumption and to do so by a preponderance of the evidence.

It also claims that, given the presumptive immunity it enjoys, the proper measure of the reasonableness of its actions is whether Dr. Goodwich "submitted any admissible evidence that would permit a reasonable jury to conclude that other reasonable hospitals would not have acted to abridge a physician's privileges under similar circumstances." It concludes that he failed to submit such evidence, as both the trial court and the Court of Special Appeals determined. *Goodwich, supra,* 103 Md.App. at 352, 653 A.2d at 546.

### III.

■ The standard of review for a grant of summary judgment is whether the trial court was legally correct. *Hartford Insurance Co. v. Manor Inn,* 335 Md. 135, 144, 642 A.2d 219, 224 (1994); *Gross v. Sussex,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Beatty v. Trailmaster,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993); *Brewer v. Mele,* 267 Md. 437, 441, 298 A.2d 156, 159 (1972). Toward this end, we must, in this case of first impression, decide the appropriate burden of production for a non-movant in a HCQIA summary judgment proceeding—that is to say, determine how one rebuts the statutory presumption that a professional review action was objectively reasonable.[22]

---

22. Federal courts, in applying the HCQIA, have concluded that the appropriate standard for a non-movant on summary judgment is "[m]ight a reasonable jury, viewing the facts in the best light for [the non-movant], conclude that [it] has shown, by a preponderance of the evidence, that the defendant[']s[] actions are outside the scope of § 11112(a)?" *Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir.1992). *See also Bryan v. Holmes Regional Medical Center,* 33 F.3d 1318, 1323 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995); *Quartemont v. St. Joseph Hospital and Health Center,* No. H-94-1787, 1995 WL 804510, 1995 U.S. Dist. LEXIS 14160 (S.D.Tex., Aug. 14, 1995). This is the standard that Sinai submits is proper and it is the one which appears to have influenced the Court of Special Appeals. *See Goodwich, supra,* 103 Md.App. at 353, 653 A.2d at 546–47 ("Dr. Goodwich has not offered sufficient evidence to permit a trier of fact reasonably to conclude, by a preponderance of the evidence, that Sinai's actions were outside the scope of § 11112(a).").

This approach to summary judgment—as articulated by the *Austin* court and its progeny, namely that the non-movant must rebut the statutory presumption by a preponderance of the evidence,—entails a

■ While it is well-settled that we must apply the substantive federal law governing a case such as this, it is equally well-settled that "[t]he law of the forum governs procedural matters." *Rein v. Koons Ford,* 318 Md. 130, 147, 567 A.2d 101, 109 (1989); *Vernon v. Aubinoe,* 259 Md. 159, 162, 269 A.2d 620, 621 (1970) ("Maryland law . . . controls as to the inferences to be drawn from the evidence, the sufficiency of the evidence, the inferences from it to go to the jury and other procedural matters."). Summary judgment practice in this state is governed by Maryland Rule 2–501. It states, in relevant part, "[t]he court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to summary judgment as a matter of law." Rule 2–501(e).[23]

■ Summary judgment is not a substitute for trial. Stated differently, its purpose is not to try the case or resolve

---

kind of weighing of the evidence. The trial judge must consider the evidence the non-movant has proffered to determine whether the preponderance standard has been met, thereby effectively creating a paper trial. Indeed, such a transformation of the summary judgment process was warned against by Justice Brennan in dissent in *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). He stated, "I am fearful that this new rule . . . will transform what is meant to provide an expedited 'summary' procedure into a full-blown paper trial on the merits." *Id.* at 266, 106 S.Ct. at 2519, 91 L.Ed.2d at 223 (Brennan, J. dissenting).

To be sure, placing the non-movant in the position of rebutting the statutory presumption by a preponderance of the evidence, as *Austin* teaches, in effect, takes the burden of persuasion applicable at trial and engrafts it onto summary judgment procedure.

23. Interestingly, Maryland Rule 2–501 is derived from Federal Rule of Civil Procedure 56. *Metropolitan Mortgage Fund v. Basiliko,* 288 Md. 25, 27, 415 A.2d 582, 583 (1980); *Berkey v. Delia,* 287 Md. 302, 306, 413 A.2d 170, 172 (1980). That rule provides, in pertinent part:

The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Rule 56(c).

factual disputes. *Hartford Insurance Co., supra,* 335 Md. at 144, 642 A.2d at 224; *Coffey v. Derby Steel Co.,* 291 Md. 241, 247, 434 A.2d 564, 567–68 (1981); *Berkey v. Delia,* 287 Md. 302, 304, 413 A.2d 170, 171 (1980); *Salisbury Beauty Schools v. State Board of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367, 373 (1973). Rather, the procedure is designed to determine whether a factual controversy exists requiring a trial. *Hartford Insurance Co., supra,* 335 Md. at 144, 642 A.2d at 224; *Beatty, supra,* 330 Md. at 737, 625 A.2d at 1011; *Foy v. Prudential Insurance Co.,* 316 Md. 418, 422, 559 A.2d 371, 373 (1989); *Metropolitan Mortgage Fund v. Basiliko,* 288 Md. 25, 28, 415 A.2d 582, 584 (1980); *Lynx, Inc. v. Ordnance Products,* 273 Md. 1, 7, 327 A.2d 502, 508 (1974); *Brewer v. Mele,* 267 Md. 437, 442, 298 A.2d 156, 160 (1972) (quoting *Lipscomb v. Hess,* 255 Md. 109, 118, 257 A.2d 178, 182–83 (1969)); *see also Bond v. Nibco,* 96 Md.App. 127, 134–35, 623 A.2d 731, 735 (1993). Thus, in keeping with Maryland law, the trial judge is not allowed to weigh evidence. This principle is also expressed in federal case law. *See, e.g., Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

 It is also true that, under Maryland law, the non-movant bears no burden of proof at the summary judgment stage. Rather, after the moving party has produced sufficient evidence in support of summary judgment, the non-movant "must demonstrate that there is a genuine dispute of material fact by presenting facts that would be admissible in evidence." *Gross, supra,* 332 Md. at 255, 630 A.2d at 1160; *see also Beatty, supra,* 330 Md. at 737, 625 A.2d at 1011. "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608, 614 (1985) (citing *Lynx, supra,* 273 Md. at 7–8, 327 A.2d at 509).

In addition, those facts must be presented "in detail and with precision," general allegations are insufficient. *Gross, supra,* 332 Md. at 255, 630 A.2d at 1160; *Beatty, supra,* 330 Md. at 738, 625 A.2d at 1011; *see also Lynx, supra,* 273 Md. at 7–8, 327 A.2d at 509. Finally, in determining whether there is a genuine dispute of material fact, the court must resolve all inferences against the moving party. *Hartford, supra,* 335 Md. at 145, 642 A.2d at 224; *Gross, supra,* 332 Md. at 256, 630 A.2d at 1160; *King, supra,* 303 Md. at 111, 492 A.2d at 614; *Coffey, supra,* 291 Md. at 246, 434 A.2d at 567; *Berkey, supra,* 287 Md. at 304–05, 413 A.2d at 171; *Leonhart v. Atkinson,* 265 Md. 219, 220, 289 A.2d 1, 2 (1972).

In Maryland, when there is a genuine issue of material fact, the evidence, or the inferences deducible therefrom, is sufficient to permit the trier of fact to arrive at more than one conclusion; consequently, the moving party is not entitled to judgment as a matter of law. Because the applicable standard in civil cases is preponderance of the evidence, *see Beatty, supra,* 330 Md. at 738–39, 625 A.2d at 1011; *Bond, supra,* 96 Md.App. at 135, 623 A.2d at 735; *Seaboard Surety v. Kline, Inc.,* 91 Md.App. 236, 244, 603 A.2d 1357, 1360 (1992), when the evidence the non-movant presents, or the inferences from that evidence, demonstrate that there is a genuine issue of material fact, it is at least arguable that he or she has met that burden. In other words, the generation of a genuine dispute of material fact is, in this context, the equivalent of meeting a preponderance of the evidence standard at trial. We thus conclude that the proper summary judgment standard in this case is whether Dr. Goodwich produced sufficient evidence of the existence of a genuine dispute as to the material fact of whether Sinai was entitled to the qualified immunity prescribed by the HCQIA.

## IV.

We shall now review seriatim Dr. Goodwich's claims that he has produced sufficient evidence to support the factual inference that Sinai failed to satisfy the standards of

§ 11112(a). In this regard, we are mindful that, in accordance with the Act, "the defendants' [professional review] action is immune if the process was undertaken in the *reasonable belief* that quality health care was being furthered." *Imperial v. Suburban Hospital Association, Inc.*, 37 F.3d 1026, 1030 (4th Cir.1994). We are also mindful that "[t]he standard is an objective one which looks to the totality of the circumstances." *Id.*

Dr. Goodwich first contends that Sinai's purpose in abridging his privileges was to insulate it from lawsuits, not to further patient welfare as § 11112(a)(1) requires. He points to language in the June 29, 1988 and March 15, 1991 letters, in which Dr. Goldstein referred not only to obtaining second opinions but also to the potential for litigation against Sinai, as evidence that the second opinion requirement was implemented out of Dr. Goldstein's fear of litigation, rather than any legitimate concern for patient welfare. To Dr. Goodwich it is extremely relevant that, in these letters, "[n]ot one word was mentioned about his actions potentially jeopardizing *patients.*"

This argument is specious. Even if the second opinion requirement was initiated out of fear of litigation, rather than patient care concerns, neither evidence of that fact nor the inferences from such evidence rebuts the presumption of reasonableness the MEC's abridgement action enjoys. This evidence may support an inference of bad faith on Sinai's part; however, as we have already pointed out, what is relevant here is the objective reasonableness of the hospital's actions, not its subjective intent or motivation. In sum, Dr. Goodwich's reliance on these two letters improperly focuses on what is more accurately characterized as the hospital's preliminary conduct, while failing to address the basis for Sinai taking the professional review action that it did; this focus does not address, not to mention rebut, the evidence that was before the MEC when it abridged Dr. Goodwich's hospital privileges.

Moreover, while it is true that these letters reference concern about litigation, it is equally true that these same letters address patient care issues. In fact, the March 15

letter characterizes Dr. Goodwich's conduct in caring for a patient as "a remarkable deviation from the standard of care. . . ." Also, and as we have seen, the letters were preceded by years of discussion and correspondence on patient care issues. In addition, as Sinai quite correctly points out, "concern about litigation and concern about patient welfare are not mutually exclusive—lawsuits are typically not filed unless an injury results. . . ." [24]

Not only is his contention concerning the letters unavailing, but Dr. Goodwich offers nothing else; he does not even direct our attention to anything, in the way of evidence or inference, that would demonstrate a genuine dispute of material fact with respect to Sinai's compliance with § 11112(a)(1). To be sure, he does rely on his testimony before the Hearing Committee and his amended affidavit in opposition to Sinai's summary judgment motion for the proposition that the institution of the second opinion requirement was undertaken for reasons related to litigation, rather than patient care. Yet, this evidence suffers from the same defect. It simply does not rebut the reasonableness of the hospital's March 8 action. In any event, it is well settled that "general allegations that do not show facts in detail and with precision" are insufficient to survive summary judgment. *Gross, supra,* 332 Md. at 255, 630 A.2d at 1160; *see also Lynx, supra,* 273 Md. at 7–8, 327 A.2d at 509. Upon examination, the evidence amounts to no more than general, imprecise allegations that cannot survive summary judgment. Thus, however viewed, it is clear that Dr. Goodwich has not produced facts, admissible in evidence, sufficient to demonstrate a genuine dispute as to the material fact of whether the restrictions Sinai imposed on his privileges were based on the reasonable belief that doing so would further quality health care. Nor do the inferences deducible from those facts he has produced generate such a dispute.

---

**24.** During the period 1985 to 1993, Dr. Goodwich was sued for medical malpractice five times. At the time of the abridgement, however, these cases remained unresolved.

Dr. Goodwich's second contention is that Sinai failed to satisfy § 11112(a)(2) because it abridged his privileges without making any reasonable effort to obtain the facts of the matter. He asserts that Drs. Taylor and Currie both failed to make inquiry into the validity of Dr. Goldstein's concerns about his practice. As he sees it, this behavior occurred because they were driven "purely by fear of litigation" rather than the quality of his patient care. As we have made clear, assuming that these allegations are accurate, the fact remains that such evidence fails to address the relevant inquiry in this case, namely the objective reasonableness of the MEC's action once the abridgement recommendation was made.

Clearly, as long as the MEC had enough information before it to justify the abridgement, it simply is irrelevant to the outcome of this case whether Drs. Taylor and Currie investigated the entire history of Dr. Goldstein's concerns about Dr. Goodwich's patient management skills or, subjectively, were driven by fear of litigation. With that said, however, we note that this record contains evidence that Dr. Goodwich does not even attempt to rebut, specifically documentation evidencing both the hospital's concerns about Dr. Goodwich's practice and that those concerns continued to be raised long after Dr. Goldstein left Sinai. Indeed, Drs. Taylor and Currie had direct involvement in these concerns. Moreover, the record reflects that not only did they independently monitor Dr. Goodwich's clinical practices during their respective tenures as Chief of the OB–GYN Department, but they also met with members of the Quality, Risk & Utilization Management staff to discuss Dr. Goodwich's compliance with the second opinion requirement.

Dr. Goodwich also asserts that the abridgement took place without any meaningful review of the cases at issue and that the Hearing Committee "rubberstamped" the MEC's decision. As evidence of the MEC's failure to investigate, he refers to Dr. Currie's Hearing Committee testimony to the effect that "the MEC in essence voted to uphold the department chairman's decision. The MEC did not go into all the

garbage. The MEC *in my opinion* looked at the fact that the chief quality assurance officer for the department, the chairman, had made recommendations and restrictions and voted to uphold them [,]" (emphasis added). Dr. Currie's statement, however, is precisely as he characterized it—an opinion. His testimony does not constitute evidence in the sense that he is an expert witness qualified to testify as to the MEC's decision-making process. Stated differently, such testimony does not constitute evidence demonstrating the existence of a genuine dispute as to the material fact of Sinai's entitlement to immunity.

Thus, we note again that the proper focus in this case is not on such unsubstantiated opinions, but rather the information the MEC had before it regarding patient care issues and violations of the second opinion requirement, when it voted to restrict Dr. Goodwich's privileges. In that regard, and without contradiction from Dr. Goodwich, the record reflects that, when the MEC met to consider permanent abridgement of his privileges, it heard from both Dr. Currie and Dr. Goodwich. Dr. Currie presented information to the MEC concerning Dr. Goodwich's failure to comply with the several and various second opinion agreements, as well as the many cases, over the years, in which his patient care practices had been questioned. Dr. Goodwich, in turn, responded to Dr. Currie's allegations and was permitted to present any information he so chose.

As for Dr. Goodwich's contention that the Hearing Committee rubberstamped the MEC's decision, the record reflects, again without contradiction by Dr. Goodwich, that the Committee consisted of a panel of three physicians selected as neutral arbiters to consider the reasonableness of the MEC's decision. It further reflects that in addition to hearing from Dr. Goodwich and his expert witness, Dr. King, all participants were provided with the opportunity to review his departmental and medical staff files, which included documentation of cases in which patient care concerns were raised as well as documentation of the successive violations of the second opinion agreements.

■ Dr. Goodwich's final assertion concerning Sinai's compliance with the requirements of § 11112(a)(2), is that Dr. King's testimony demonstrates that he was "in no way a threat to patient welfare." Indeed, according to Dr. Goodwich, Dr. King testified that some of the cases the MEC reviewed were not breaches of the standard of care, at all, "once adequate inquiry was made," but that the MEC made no such inquiry.[25]

■ Unfortunately, Dr. Goodwich's proffer of Dr. King's expert testimony misses the mark. As we have seen, the relevant focus is whether the MEC had enough evidence to make an objectively reasonable decision—not whether, in any given instance, there was a breach of the standard of care. Indeed, the Act itself "does not require that the professional review result in an actual improvement of the quality of health care." *Imperial, supra,* 37 F.3d at 1030. Given the detailed information Sinai had before it, as revealed by the record, none of which Dr. Goodwich has directly challenged, we conclude that Dr. Goodwich has not produced any evidence tending to demonstrate a genuine dispute of material fact as to whether Sinai made a reasonable effort to obtain the facts of the matter. His allegations to the contrary are nothing more than "general allegations that do not show facts in detail [or] with precision," *Gross, supra,* 332 Md. at 255, 630 A.2d at 1160, which cannot survive summary judgment.

■ Dr. Goodwich's final contention is that Sinai's review action was not taken in the reasonable belief that the action was warranted by the facts known, thereby violating § 11112(a)(4). As he sees it, there was no admissible evidence

---

**25.** Dr. Goodwich also contends that Dr. King provided evidence of a genuine dispute of material fact when he testified, in effect, "that a reasonable hospital (i.e. one with a basic understanding of the insurance industry) would not have imposed this specific [second opinion] requirement upon Dr. Goodwich or abridged his privileges for noncompliance without further inquiry." This contention was not raised in his summary judgment affidavit and, thus, was not considered by the trial judge in ruling on the motion. Therefore, we do not consider it now.

to suggest that the second opinions were necessary or that he represented a danger to patient welfare. Essentially, his argument is that there was an insufficient nexus between the March 8 abridgement and the factual context in which it arose. To support this conclusion, he claims that in many of the cases offered in support of abridgement, second opinions "were in fact part of the file," and that Sinai made no effort to discover the facts underlying the absence of a written second opinion in the remaining cases "to see if patient welfare was in jeopardy."

We begin our analysis by addressing Dr. Goodwich's assertion that there was no evidence to suggest that the second opinions were necessary or that he represented a danger to patient welfare. Without question, the record refutes both of these assertions. As to the necessity of the second opinion requirement, Dr. Goodwich himself repeatedly agreed to the wisdom of its use. Having said that, we simply point out that such allegations are irrelevant to our focus here—a focus in which we must decide whether, upon consideration of the totality of the circumstances, Sinai's professional review action was objectively reasonable. For reasons that by now should be apparent, we respond to this inquiry in the affirmative.

As to the remainder of Dr. Goodwich's argument on this issue, specifically that in "many" of the cases at issue in the abridgement process, second opinions were part of the file, the only factual support he offers is Dr. King's testimony concerning two cases he reviewed. At the April 30 Hearing, Dr. King testified that in one case, there was a written consultation in the patient's chart. Although he conceded that, in the other case, there was no written second opinion in the chart, Dr. King maintained that the chart did reflect that another attending physician was "actively involved in the management of that patient." Such evidence hardly supports the proposition that the MEC acted unreasonably, especially when considered in the context of the numerous cases in which no second opinions were obtained, of which it was made aware. We have already addressed Dr. Goodwich's contention that Sinai neglected to

review the cases in which a second opinion was absent to see if patient welfare was threatened.

## V.

In this case, the record reflects that the restriction of Dr. Goodwich's privileges was limited to the activity prompting it, namely his repeated failure to comply with the second opinion requirement—a requirement he *voluntarily* consented to many times over a four-year period. In light of that noncompliance and the record of patient care-related issues raised with him over an extended period, the summary judgment record reflects clear evidence sufficient to establish that the hospital, conscious of the need to protect its patients, acted in an objectively reasonable fashion in restricting Dr. Goodwich's privileges.

The evidence proffered by Dr. Goodwich, rather than rebutting the objective reasonableness of those actions, addressed preliminary and tangential matters, thus failing to demonstrate a genuine dispute of material fact as to that issue, the only one before the court. We hold, therefore, as did the Court of Special Appeals, that the trial court was legally correct in its grant of summary judgment. *Goodwich, supra,* 103 Md.App. at 353, 653 A.2d at 547.

Our decision is based upon HCQIA immunity provisions, so we do not reach the applicability of the Maryland statutory provisions. We, therefore, pause only to voice our agreement with the Court of Special Appeals that because the Maryland statute requires that a member of a review committee act in good faith, while the HCQIA employs objective standards of reasonableness, "[t]he State law ... may, *in some circumstances,* provide additional immunity or protection to medical review bodies. The State law is preempted by the Federal only to the extent that it provides *less* immunity than the Federal, not to the extent it provides *more.*" *Id.* at 355, 653 A.2d at 548.

*JUDGMENT AFFIRMED, WITH COSTS.*