697 A.2d 861

**Elizabeth MURPHY, et al.**

v.

**John J. MERZBACHER, et al.**

**No. 55, Sept. Term, 1996.**

Court of Appeals of Maryland.

July 28, 1997.

Reconsideration Denied Sept. 5, 1997.

526

Jeffrey P. Shiller (Suder & Suder, P.A.), Baltimore, Wayne M. Willoughby (Robin R. Smith, Janet, Willoughby & Gershon, L.L.C., all on brief), Baltimore, for Appellants.

Robert H. House, Jr. (Gregory L. VanGeison, Anderson Coe & King, L.L.P., on brief), Baltimore, Kevin M. Murphy (Samuel J. Smith, Jr., Carr, Goodson, Lee & Warner, on brief), Washington, DC, for Appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

KARWACKI, Judge.

Maryland Code (1974, 1995 Repl.Vol.), § 5–101 of the Courts and Judicial Proceedings Article, Maryland's general statute of limitations, ordinarily requires a civil lawsuit to be filed within three years from the date the action accrues. Nonetheless, section 5–201(a) of that same Article provides that

> "[w]hen a cause of action subject to a limitation under Subtitle 1 of this title accrues in favor of a minor or mental incompetent, that person shall file his action within the lesser of three years or the applicable period of limitations after the date the disability is removed."

We are asked in this appeal whether a defendant can be equitably estopped from asserting limitations when threats by the defendant have allegedly prevented or otherwise frustrated the plaintiff from bringing suit within the applicable limitations period. Without foreclosing that possibility, we nonetheless shall hold that under the circumstances presented in this case, Appellants' claims are barred for a want of timely prosecution.

## I.

The genesis of this appeal reaches back nearly twenty years to the 1970's when twelve of the Appellants were students at the Catholic Community Middle School of South Baltimore, Inc. The Archdiocese of Baltimore, Division of Catholic Schools ("Archdiocese"), employed John Joseph Merzbacher as an instructor at that school. According to the Appellants,[1] Merzbacher, with the constructive, and in some instances, actual knowledge of the Archdiocese, subjected Appellants to a systematic and brutal campaign of sexual, physical, and emotional violence during their tutelage at the Catholic Communi-

---

1. Sharon Bruce, Jane Doe, Mike Doe, Maryland Lewandowski, Bryan House, Elizabeth Murphy, James Doe, Katherine Micolowski, Mary Doe, Melody Smith, Steven Melnick, Angela Farley, Jane Roe and Edward Blair.

ty Middle School.[2]   In an effort to conceal his wrongdoing, Merzbacher allegedly threatened his victims and their families with violence and death if the authorities were *ever* informed of his actions.   Appellants concede that the last threat by Merzbacher to any one of them occurred no later than 1980, and that all threats ceased before any of the Appellants reached the age of majority.

In January of 1994, Merzbacher was indicted in the Circuit Court for Baltimore City for the rape and sexual child abuse of Elizabeth Murphy, an Appellant in the case *sub judice.*   On June 8, 1995, a jury convicted Merzbacher of those crimes, and he was sentenced to life imprisonment plus ten years.[3]   The Court of Special Appeals affirmed Merzbacher's convictions and sentences.[4]

On January 6, 1994, Appellant Murphy filed the first of fourteen civil complaints filed by Appellants in the Circuit Court for Baltimore City against Merzbacher and the Archdiocese.   Murphy, along with the other Appellants, sought compensatory and punitive damages for various intentional and non-intentional torts resulting from their alleged sexual abuse by Merzbacher.

The Archdiocese responded with a Motion to Dismiss asserting Maryland's three-year statute of limitations.[5]   Appel-

---

2.   Petitioners Bryan House and Angela Farley were never enrolled in the Catholic Community Middle School, although Mr. House did attend summer classes at the school on an informal basis and lived with Merzbacher for a period of time.   Ms. Farley was apparently a friend of Mr. House.   Both maintain that they were victims of Merzbacher's attacks.

3.   Merzbacher's sentencing took place on July 21, 1995.

4.   *John J. Merzbacher v. State of Maryland,* No. 1400, September Term, 1995, 111 Md.App. 745 (1996) (unreported), *cert. granted,* 344 Md. 115, 685 A.2d 450 (1996).

5.   To the extent Appellants' Complaints alleged counts of assault, those claims are governed by Maryland Code (1974, 1995 Repl.Vol.), § 5–105 of the Courts and Judicial Proceedings Article which provides that "[a]n action for assault ... shall be filed within one year from the date it accrues."   Otherwise, Appellants' claims are subject to Maryland's general three-year statute of limitations.   It provides:

lants in turn argued that Merzbacher's death threats should equitably estop the Archdiocese from raising limitations as a defense. On September 9, 1994, the circuit court denied Respondent's Motion to Dismiss so that the parties could conduct limited discovery on the issue of whether the Appellants were under continuous duress from the time of the alleged threats through three years prior to the filing of the actions below.

Following discovery, the Archdiocese filed a new Motion to Dismiss, or, in the Alternative, [a Motion] for Summary Judgment, once again pleading limitations as a defense. On October 26, 1995, the circuit court issued a Memorandum and Order granting summary judgment in favor of the Archdiocese, concluding that although threats may estop a defendant from asserting limitations, Appellants' claims were nonetheless barred since Merzbacher's threats ceased long before "the victims reached the age of majority [and] the three year period of limitations period that followed." Judgment was similarly entered in favor of Appellee Merzbacher on November 16, 1995.

Because they contained common issues of law and fact, the court consolidated Appellants' cases for "the purposes of discovery, pre-trial matters, and appellate review." That Order issued on November 21, 1995, and served as a final and joint judgment in favor of Merzbacher and the Archdiocese in all of the Appellants' cases. Appellants then noted a timely appeal to the Court of Special Appeals. We issued a Writ of Certiorari on our own motion before consideration of the cases by the intermediate appellate court. Such other facts as necessary are incorporated into the discussion below.

## II.

██ As this is an appeal from a grant of summary judgment in Appellees' favor, our sole task is to determine whether

---

"§ 5-101. Three-year limitation in general.
    A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

the trial court was legally correct. *Beatty v. Trailmaster,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993); *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608, 614 (1985). In that regard, summary judgment is appropriate when there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Maryland Rule 2–501; *Bowen v. Smith,* 342 Md. 449, 454, 677 A.2d 81, 83 (1996).

■ In assessing the court's actions below, we point out that "ordinary principles governing summary judgment ... continue to apply when the issue on summary judgment is limitations[.]" *O'Hara v. Kovens,* 305 Md. 280, 304, 503 A.2d 1313, 1325 (1986). If the plaintiff files his or her action beyond the limitations period, it is generally barred, entitling the defendant to judgment as a matter of law.

■ We have previously observed that a statute of limitations is nothing more than "the legislature's judgment about the reasonable time needed to institute [a] suit." *Doe v. Maskell,* 342 Md. 684, 689, 679 A.2d 1087, 1089 (1996). As the United States Supreme Court acknowledged over fifty years ago:

"Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. (Internal citation omitted). They are by definition arbitrary, and their operation does not discriminate between the just and unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate."

*Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628, 1635 (1945). Thus, when plaintiffs imprudently prolong their decision to bring an action, these statutes act as a complete bar to their claims,

relieving potential defendants from the pending burden. *Doe,* 342 Md. at 689–90, 679 A.2d at 1089–90.

Ordinarily, our statute of limitations begins to "accrue" on the date of the wrong. The assumption, of course, is that "a potential tort plaintiff is immediately aware that he [or she] has been wronged [and] is therefore put on notice that the statute of limitations" is running. *Harig v. Johns–Manville Products,* 284 Md. 70, 76, 394 A.2d 299, 303 (1978). The nature of some torts, however, belies this assumption. Thus, when stealth, subterfuge, or other difficulties of detection leave a plaintiff "blamelessly ignorant" of the facts and circumstances legally entitling him or her to relief, the statute does not begin to run against the plaintiff, unless he or she knows, or through the exercise of reasonable diligence should know, of the wrong. *Doe, supra,* 342 Md. at 690, 679 A.2d at 1090 (*quoting Poffenberger v. Risser,* 290 Md. 631, 637, 431 A.2d 677, 681 (1981)); *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 334, 635 A.2d 394, 399 (1994). This so-called "discovery rule" is not so much an exception to the statute of limitations, as it is a recognition that the Legislature, in employing the word "accrues" in § 5–101 never intended to close our courts to plaintiffs inculpably unaware of their injuries. *Harig, supra,* 284 Md. at 80, 394 A.2d at 305 (*quoting Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (construing statute of limitations within Federal Employers' Liability Act and holding unreasonable and inequitable notion that action accrues on the date of the last known exposure to an inherently unknowable harm)); *see also Hecht, supra,* 333 Md. at 333, 635 A.2d at 399 (when limitations are at issue, it is necessary to judicially determine when accrual occurred to trigger the operation of the statute).[6]

Otherwise, we have consistently held that our statutes of limitations are to be strictly construed, and absent a legislative

---

**6.** Petitioners do not attempt, and indeed cannot attempt, to argue that they were only recently aware of their injuries. Such an argument would strain credulity. *See, e.g., Doe v. Archdiocese of Washington, et al.,* 114 Md.App. 169, 689 A.2d 634 (1997).

creation of an exception, we " 'will not allow any implied or equitable exception to be engrafted upon it.' " *Garay v. Overholtzer,* 332 Md. 339, 359, 631 A.2d 429, 431 (1993) *(quoting Booth Glass Co. v. Huntingfield Corp.,* 304 Md. 615, 623, 500 A.2d 641, 645 (1985)); *Walko Corp. v. Burger Chef,* 281 Md. 207, 210–11, 378 A.2d 1100, 1101–02 (1977) (traditional rule concerning tolling of statutes of limitations can be fairly termed one of strict construction); *McMahan v. Dorchester Fert. Co.,* 184 Md. 155, 160, 40 A.2d 313, 315–16 (1944).

## III.

Appellants endeavor to persuade us that Merzbacher and the Archdiocese should be equitably estopped from asserting limitations or alternatively, that this Court should recognize an exception to the general statute of limitations under a theory of duress.  In our view, however, there is no meaningful distinction between the two theories advanced by Appellants.  Rather, duress and estoppel share a cause and effect relationship.  It is upon the grounds of duress that Appellants seek to estop Merzbacher and the Archdiocese from asserting limitations.

### Estoppel by Duress

### a.

Despite our historically strict stance on statutes of limitations, this Court first intimated in 1972 that "unconscionable, inequitable, or fraudulent act[s] of commission or omission upon which another relie[s] and has been mislead to his [or her] injury," may equitably estop a defendant from raising limitations as a defense under a general statute of limitations.[7]

---

7.  In *Chandlee v. Shockley,* 219 Md. 493, 150 A.2d 438 (1959) this Court noted that some statutes limit the right of recovery (such as § 5-101) and some create a new cause of action but employ a time limit as a condition precedent (such as then Md.Code (1957), Art. 93, § 112) (granting the right of third parties to sue estate executors or administrators "in any action which might have been maintained against the deceased[.] )."  Nevertheless, both species of statutes are subject to being tolled by affirmative acts of waiver or fraud on the part of the

*Leonhart v. Atkinson,* 265 Md. 219, 227–28, 289 A.2d 1, 6 (1972). In that case, the Leonharts and their corporation brought suit outside the then applicable limitations period [8] against Atkinson, a certified public account, for alleged professional malpractice. The trial court granted a defense motion for summary judgment on limitations grounds. In affirming that decision, our predecessors declined to find conduct giving rise to an estoppel, noting that at no time did Atkinson "ask[ ] the Leonharts to forbear bringing suit against him, . . . indicate [that] he would waive the defense of limitations should the [Leonharts] make a later claim, or that he induced them not to file suit by giving assurances that he would settle any claim they might make." *Leonhart,* 265 Md. at 228, 289 A.2d at 6.

A few months later, a similar result obtained in *Nyitrai v. Bonis,* 266 Md. 295, 292 A.2d 642 (1972), but for a different reason. In *Nyitrai,* our predecessors recognized that

> "where the inducement for delay or the hindrance to the commencement of an action has ceased to operate before the expiration of the limitation period so as to afford the plaintiff ample time thereafter in which to institute his action prior to the running of the statute of limitations, he cannot excuse his failure to do so on the ground of estoppel." (Citations omitted).

defendant. *Accord Cornett v. Sandbower, Adm'r,* 235 Md. 339, 201 A.2d 678 (1964); *Jordan v. Morgan, Adm'x,* 252 Md. 122, 249 A.2d 124 (1969). This Court nodded approvingly to the decision by the United States Court of Appeals for the Fourth Circuit in *Scarborough v. Atlantic Coast Line R. Co.,* 178 F.2d 253 (4th Cir.1949). The *Scarborough* court held that because the railroad's claim agent erroneously informed the claimant regarding the amount of time he had to initiate suit thereby inducing him to delay his action until the applicable limitations period had expired, equity estopped the railroad from raising limitations as a defense.

8. Then Maryland Code (1957, 1972 Repl.Vol.), Art. 57, § 1 provided that "[a]ll actions of account, actions of assumpsit, or on the case . . . shall be commenced, sued or issued within three years from the time the cause of action accrued[.]"

266 Md. at 299–300, 292 A.2d at 644. The Court concluded that although the plaintiff was entitled to raise an estoppel against the defendant, she had unreasonably delayed her suit by waiting eleven months to bring her action after the grounds for the estoppel had ceased. Thus, the defendant in the action was entitled to raise limitations as a defense.

■ Stated succinctly, "equitable estoppel will not toll the running of limitations absent a showing that the defendant 'held out any inducements not to file suit or indicated that limitations would not be pleaded,'" *Booth Glass, supra,* 304 Md. at 624, 500 A.2d at 645 (*quoting Nyitrai, supra,* 266 Md. at 300, 292 A.2d at 645), and that the plaintiff brought his or her action within a reasonable time after the conclusion of the events giving rise to the estoppel.

**b.**

The inducements to which Appellants point are Merzbacher's alleged threats. Although a novel application of the estoppel rule in Maryland, we, like the First Appellate District of the Courts of Appeal of California, agree that such an application is "plausible." *See DeRose v. Carswell,* 196 Cal. App.3d 1011, 1026, 242 Cal.Rptr. 368, 377 (1987); *see also Jones v. Jones,* 242 N.J.Super. 195, 208, 576 A.2d 316, 322 (1990) (duress tolls the statute of limitations, at least, when, as here, it is either an element of or inherent in the underlying cause of action). Indeed, a potential tort plaintiff can as much be induced to delay his or her action by an affirmative threat, as he or she can by a false promise.

In a case factually similar to the instant case, the Supreme Court of California considered the timeliness of a sexual assault claim under the one-year statute of limitations set forth in California's Tort Claims Act. As that court observed

"[e]stoppel most commonly results from misleading statements about the need for or advisability of a claim; actual

fraud or the intent to mislead is not essential.[9] (Internal citations omitted). *A fortiori,* estoppel may certainly be invoked when there are acts of *violence* or *intimidation* that are *intended* to prevent the filing of a claim. (Original emphasis)."

*John R. v. Oakland Unified School Dist.,* 48 Cal.3d 438, 445, 256 Cal.Rptr. 766, 769 P.2d 948, 951 (1989).

New York takes a similar view of limitations with respect to estoppel by duress in minority sexual assault cases. *See Zoe v. Frederick F.G.,* 617 N.Y.S.2d 370, 208 A.D.2d 675 (1994); *Doe v. Roe,* 596 N.Y.S.2d 620, 192 A.D.2d 1089 (1993); *Hoffman v. Hoffman,* 556 N.Y.S.2d 608, 162 A.D.2d 249 (1990). Under New York law, as in our holding in *Nyitrai, supra,* plaintiffs seeking to avoid limitations on the grounds of duress must show that they brought their actions within a reasonable time after the events giving rise to the estoppel have ceased. *Zoe,* 617 N.Y.S.2d at 371, 208 A.D.2d at 675; *Doe,* 192 A.D.2d at 1090–91, 596 N.Y.S.2d at 621; *Hoffman,* 556 N.Y.S.2d at 608, 162 A.D.2d at 249. We note, however, that in none of these cases did the court permit the plaintiff to escape limitations under a theory of estoppel by duress.

Although Appellants suggest otherwise, California parallels the New York approach. For example, in *DeRose, supra,* the

---

**9.** This view of estoppel is consistent with Maryland law. In *Knill v. Knill,* this Court observed that it has consistently viewed equitable estoppel as

" 'the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise have existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.' " 306 Md. 527, 534, 510 A.2d 546, 549 (1986) (*quoting* 3 J. Pomeroy, *Equity Jurisprudence,* § 804 (5th ed. 1941)). The court also noted that "[a]lthough wrongful or unconscionable conduct is generally an element of estoppel, an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other." *Knill,* 306 Md. at 534, 510 A.2d at 549–50 (citations omitted).

First Appellate District of the Courts of Appeal of California rejected a sexual abuse victim's claim that "threat[s], and fear of harm from the defendant" prevented her from filing suit within the applicable limitations period because "she did nothing to pursue her claims even after [the defendant's] conduct [that gave rise to the estoppel] ceased." 196 Cal.App.3d at 1026, 242 Cal.Rptr. at 377 (*citing Lobrovich v. Georgison*, 144 Cal.App.2d 567, 301 P.2d 460 (1956)).[10]

In so holding, that court observed that:

"[the plaintiff] expressly alleged that [the offensive] conduct occurred . . . 'when she was approximately four years old and until she was 11 years old (1966–1973).' The Court in . . . *Lobrovich* [, *supra*] held that five weeks were sufficient time for the plaintiff to institute an action after the conduct giving rise to an estoppel ceased. In this case, [the plaintiff] had a year to file suit as an adult."

196 Cal.App.3d at 1026, 242 Cal.Rptr. at 377.

Despite the holding in the above cases, Appellants direct our attention to *John R.*, *supra*. Although the precise issue in *John R.* was the timeliness of a minor's claim against the Oakland Unified School District ("District") for alleged acts of sexual molestation by a teacher under the doctrine of respondent superior, the estoppel argument raised against the District is identical to the argument Appellants press here. In order to fully appreciate the relevance of *John R.*, a review of its pertinent facts and law will serve to illuminate the present controversy.

### c.

Fourteen year-old John R. was allegedly molested by his mathematics teacher over a period of several months, with the

---

**10.** The *Lobrovich* court held that "[i]f there is still ample time to institute the action within the statutory period after the circumstances inducing delay have ceased to operate, the plaintiff who failed to do so cannot claim an estoppel." *Lobrovich v. Georgison*, 144 Cal.App.2d 567, 573, 301 P.2d 460, 464 (1956). This view accords with our holding in *Nyitrai v. Bonis*, 266 Md. 295, 292 A.2d 642 (1972).

last act occurring in February, 1981. Ten months later, in December, 1981, John R. reported the alleged incidents to his father. John's mother in turn shared her son's accusations with the District that same month. She was advised to let the police, who were promptly notified by the District, intervene. John's mother then contacted an attorney, who advised her to wait for criminal charges to be substantiated prior to pursuing any civil remedy. For reasons not relevant here, the criminal charges against the teacher were eventually dismissed. *See John R.*, 48 Cal.3d at 442 n. 2, 256 Cal.Rptr. at 768 n. 2, 769 P.2d at 950 n. 2.

Thereafter, John's parents brought suit on his behalf and in their own right against the teacher and the District. At the trial's outset, judgment was entered in favor of the District on all counts, based upon, *inter alia,* limitations.

Under California law, limitations ordinarily do not accrue against a minor until he or she reaches the age of majority, after which time any action has to be brought within one year. *See* CAL.CIV.PROC.CODE § 352 (West 1989). The California Tort Claims Act, however, affords minors no grace period. *See* CAL.GOV'T CODE §§ 901, 911.2 and 911.4(b) (West 1989). Any claims accruing in favor of a minor against a public entity must be made in writing within 100 days of the date the action accrues. CAL.GOV'T CODE § 911.2. Failing that, CAL.GOV'T CODE § 911.4(b) requires that leave to file a late claim be made within one year of the action's accrual date. John R.'s parents first filed suit some fifteen months beyond the date John R. was last assaulted. Thus, the trial court held that limitations barred all claims against the District.

A California intermediate appellate court reversed, concluding that at least with respect to the limitations issue, the plaintiffs should have enjoyed the benefit of the "delayed discovery" doctrine. *John R.*, 48 Cal.3d at 444, 256 Cal.Rptr. at 769, 769 P.2d at 951. The District appealed that decision.

Though questioning the soundness of the lower appellate court's application of "delayed discovery," the Supreme Court of California nonetheless thought a remand to the trial court

was in order so that the court could determine whether the District should be estopped from asserting limitations under what could fairly be called a theory of vicarious equitable estoppel [11]—a theory incidentally, that we neither address nor adopt today. *See* Part IV., *infra*.

Noting that the trial court failed to undertake such an analysis of the timeliness of John R.'s claims, California's highest court ordered that factual findings be made with respect to "(1) whether any threats were in fact made by the teacher, (2) when the effect of any such threats ceased, or (3) whether the plaintiffs acted within a reasonable time after the coercive effect of the threats ceased." [12]   It is this factual

---

11.   In so holding, the Supreme Court of California opined that

"assuming plaintiffs can establish their case, it would plainly be inequitable to permit the [D]istrict to escape liability only because the teacher's threats succeeded in preventing his victim from disclosing the molestation until the time for filing a claim against the [D]istrict had elapsed.  We conclude that, for purposes of applying equitable estoppel, the time for filing a claim against the [D]istrict was tolled during the period that the teacher's threats prevented plaintiffs from pursuing their claims."

*John R. v. Oakland Unified School Dist.*, 48 Cal.3d 438, 446, 256 Cal.Rptr. 766, 770, 769 P.2d 948, 952 (1989).

12.   In light of the facts as alleged by the plaintiffs in *John R.*, its holding gives us pause.  Equitable estoppel will bar a defendant from raising limitations as a defense so long as the defendant's voluntary conduct prevented the plaintiff from filing suit within the applicable limitations period, and the plaintiff pursued his or her claim within a reasonable amount of time following the cessation of the events prompting the estoppel.  The plaintiffs in *John R.*, however, expressly acknowledged that the teacher's acts were disclosed to the parents ten (10) months after the molestation had terminated and that the plaintiffs delayed their suit pending the resolution of criminal charges against the teacher on the advice of their attorney.  The first claim against the teacher and District was thus not brought until fifteen (15) months after the teacher's alleged conduct had ceased.

While conceivably the teacher's actions could have delayed plaintiffs' suit beyond the 100 day limitations period set forth in CAL. GOV'T CODE § 911.2, no such assertion can be made with respect to the plaintiffs' failure to apply for leave to file a late claim within one year as required by CAL. GOV'T CODE § 911.4(b).  Indeed, plaintiffs' own counsel instructed them not to file suit until resolution of the criminal proceedings.  That aside, the defendant's conduct in no way prevented plaintiffs from filing suit within the two months after John R. disclosed the abuse.

inquiry that Appellants maintain was improperly left unresolved in the instant case. Thus, the argument goes, a remand is necessary. We see it differently.

## IV.

■ There is a critical, and in our view, dispositive difference between facts of *John R.* and the case *sub judice.* The running of the California statutes was not tolled by John R.'s minority, and the cessation of his teacher's conduct triggered the statutes' march towards finality. Thus, John R. and his parents were arguably deprived of a portion of their limitations period by the alleged acts and omissions of the defendants. *But see* n. 13, *supra.* In the instant case, Appellants cannot and do not claim that they were so deprived. Indeed, Md.Code (1995 Repl.Vol., 1996 Supp.), § 5-201 of the Courts and Judicial Proceedings Article provides in relevant part:

"§ 5-201. **Persons under a disability.**

(a) *Extension of time.*—When a cause of action subject to a limitation under Subtitle 1 of this title accrues in favor of a minor or mental incompetent, that person shall file his action within the lesser of three years or the applicable period of limitations after the date the disability is removed.

(b) *Exception.*—This section does not apply if the statute of limitations has more than three years to run when the disability is removed."

Appellants concede that none of them had any contact with Merzbacher whatsoever after reaching the age of majority, and some of the Appellants' last contact with him occurred well before that time. Thus, by their own admissions, Appellants enjoyed the full limitations period provided to them by the General Assembly.

Nonetheless, Appellants attempt to elude this inconvenient fact by two different, but related routes. First, they maintain that "as a general rule ... whether a cause of action is barred

Stated otherwise, there was no cause/effect relationship between the defendant's conduct and plaintiffs' failure to comply with § 911.4(b).

by the statute of limitations is ordinarily a mixed question of law and fact that may be taken from the jury only when the court determines as a matter of law that the suit was not instituted within the proper time." *James v. Weisheit,* 279 Md. 41, 46, 367 A.2d 482, 485 (1977); *see also Impala Platinum v. Impala Sales,* 283 Md. 296, 323, 389 A.2d 887, 903 (1978). Appellants contend that although the conduct of Merzbacher ceased before the statute of limitations began to run against their claims, the *effect* of Merzbacher's threats lasted until the filing of the actions below, or at the very least, a reasonable jury could so find. *See O'Hara v. Kovens, supra,* 305 Md. at 301, 503 A.2d at 1323 (questions of fact on which a limitations defense will turn are to be decided by the fact finder).

Appellants also maintain that the policy reasons undergirding statutes of limitations militate towards tolling in the instant case. In the Appellants' view, those policies are not implicated when, as here, their claims are not fraudulent, the witnesses are presently available and willing to testify, the evidence is still fresh, and no inconvenience would accrue to Merzbacher or the Archdiocese. *See generally Doe v. Maskell, supra,* 342 Md. at 689, 679 A.2d at 1089; *Pennwalt Corp. v. Nasios,* 314 Md. 433, 437, 550 A.2d 1155, 1158 (1988); *Hecht v. Resolution Trust Corp.,* 333 Md. 324, 333, 635 A.2d 394, 399 (1994); *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983); *Goldstein v. Potomac Elec. Power Co.,* 285 Md. 673, 684, 404 A.2d 1064, 1069 (1979); *Harig v. Johns–Manville Prods. Corp., supra,* 284 Md. at 75, 394 A.2d at 302.

We disagree for several reasons. First and foremost, we conclude as a matter of law that under the applicable principles of estoppel, no jury could find that Appellants acted within a reasonable period of time following the cessation of Merzbacher's conduct. There was absolutely no evidence that Merzbacher made any threats to the appellants or that he engaged in any overt acts after 1980, and consequently during the three-year period which followed their attaining the age of majority, that prevented Appellants from filing timely actions.

Minority is a valid excuse for not commencing suit within the three year general limitations period; unsubstantiated fear of retaliation is not.

Under this Court's holding in *Nyitrai, supra,* if the cessation of the defendant's conduct affords the plaintiff ample time thereafter in which to institute his or her action prior to the running of the statute of limitations, he or she cannot raise an estoppel argument to bar a defense of limitations. 266 Md. at 299–300, 292 A.2d at 644. It follows that if the alleged conduct ceases *before* the statute begins to run, the same holds true.

Further, as we indicated in *Doe v. Maskell, supra,* a statute of limitations is nothing more than a legislative judgment about the amount of time needed to initiate a suit. 342 Md. at 689, 679 A.2d at 1089. Appellants implore this Court to ignore that judgment and substitute its own. Recognizing the peculiar difficulties visited upon those of tender years who are injured in their minority, our Legislature has already determined the amount of time reasonably needed to bring an action after reaching the age of majority. We cannot disturb that determination.

Also, whether or not the concerns prompting statutes of limitations are absent in the instant case is quite beside the point. Again, it is neither the duty nor the province of this Court to rewrite a legislative enactment simply because it is socially useful or judicially expedient to do so. That function belongs solely to the General Assembly.

Accordingly, we hold that in view of the fact that Merzbacher's alleged threats ceased before any of the Appellants reached the age of majority, their failure to maintain their actions within the applicable limitations period after that date was unreasonable as a matter of law and absolutely bars their claims against Merzbacher.

## V.

Appellants also contend that Merzbacher's alleged threats should be imputed to the Archdiocese to similarly prevent it

from raising limitations as a defense to Appellants' claims. Because we conclude that those claims are barred against Merzbacher, Appellants' claims are likewise barred against the Archdiocese. Thus, we need not reach the issue of whether Merzbacher's conduct should be imputed to the Archdiocese for the purpose of applying equitable tolling principles.

*JUDGMENTS AFFIRMED, WITH COSTS.*

ELDRIDGE and RAKER, JJ., dissent.

ELDRIDGE, Judge, dissenting.

The majority reaches a result that allows Merzbacher to profit from the threats, violence and intimidation which he used to prevent the plaintiffs from maintaining actions against him based on the repeated rapes and abuse which Merzbacher inflicted upon the plaintiffs. This result is unconscionable. It is also inconsistent with this Court's prior opinions. Moreover, the result is not in accord with the public policies underlying statutes of limitations. Under the extraordinary circumstances presented, I would apply principles of estoppel and/or duress and allow the plaintiffs in these cases to pursue their civil claims against Merzbacher.[1]

I.

In determining whether summary judgment was properly granted in these cases, this Court must view all evidence, and inferences derived therefrom, against the moving parties.

---

1. The principles of estoppel and duress, while spoken of interchangeably by the majority, are analytically different. Estoppel focuses primarily on the conduct of the defendant, and "operates as a technical rule of law to prevent a party from asserting his rights where it would be inequitable and unconscionable to assert those rights." *Savonis v. Burke,* 241 Md. 316, 319, 216 A.2d 521, 523 (1966). The principle of duress, on the other hand, focuses on the state of mind of the reasonable plaintiff. It reflects the policy that a plaintiff should not be penalized for conduct or inaction which reasonably was the product of duress. The present cases, in my view, involve an area where the two principles overlap and where both principles are applicable. Accordingly, like the majority, I shall not discuss each principle separately.

*Goodwich v. Sinai Hosp. of Baltimore,* 343 Md. 185, 207, 680 A.2d 1067, 1078 (1996); *B G & E Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307, 311 (1995); *Rose v. Fox Pool,* 335 Md. 351, 380, 643 A.2d 906, 920 (1994); *Merchants Mortgage Co. v. Lubow,* 275 Md. 208, 217, 339 A.2d 664, 670 (1975). The facts in these cases were presented, for the most part, through the deposition testimony of twelve plaintiffs.[2] Their testimony was at no time disputed by affidavits or discovery.[3] Thus, for purposes of this appeal, we must assume that the facts, as presented below through the plaintiffs' deposition testimony, are true. *See Sheets v. Brethren Mutual Ins. Co.,* 342 Md. 634, 638–639, 679 A.2d 540, 542 (1996).

## A.

A brief review of each deposed plaintiff's testimony is as follows.

### Jane Doe

While Jane was a student at the Catholic Community Middle School, Merzbacher continuously fondled her in front of other students. After Jane informed her father that Merzbacher had unsnapped her bra during class, Jane's father complained to the principal, and warned Merzbacher not to touch his daughter again. (E. 153).[4] A few days later,

---

**2.** While there were actually fifteen plaintiffs, there were only twelve who were deposed. One of the plaintiffs committed suicide before a deposition could be taken, and the other two were unavailable for deposition.

**3.** The defendant Merzbacher's deposition was taken, and he did not contradict any of the facts set forth in the plaintiffs' depositions. Merzbacher pleaded the Fifth Amendment's privilege against self-incrimination in response to most of the questions asked during his deposition.

**4.** Although normally we do not in opinions set forth references to the record extract before this Court, in light of the extreme nature of Merzbacher's conduct which was repeatedly testified to in these cases, I have decided to do so. "E" references are to the pages of the record extract filed in this Court.

Merzbacher held a gun to Jane's head and raped her. Merzbacher also forced a male student to rape her. (E. 156). When Jane resisted and began crying, Merzbacher told her to "shut up, you fucking bitch, before I kill you." (E. 155). While still holding the gun, Merzbacher told Jane that "if you ever tell anybody about this, I'll kill you and I'll kill your whole fucking family in a blink of an eye." (E. 156). Furthermore, Jane testified that

> "[Merzbacher] was furious that I told my father about the incident in the classroom, and he told this guy, he said, tell her what I did to the last girl's father who came to this school and complained about me ... [and] the guy told me that he had killed the girl's father. And I was hysterical, and I can remember being so upset that he was going to kill my family." (E. 154).

About a year after this incident occurred, Merzbacher "drove by [Jane's neighborhood] in his car like real slow, and he gave me that look like ... he was going to kill me or something. And, ... I was having such bad nightmares after that, and that's when I tried to commit suicide, because I didn't see no way out. I couldn't tell my mother. I couldn't tell my father. I couldn't tell anybody." (E. 159).

### James Doe

Throughout the period during which Merzbacher taught James at the Catholic Community Middle School, Merzbacher fondled James's buttocks and other private areas in front of other students, "raped" him, and forced him to fondle female students. (E. 116–118). Merzbacher also physically abused James by kicking him, twisting his arm, and throwing books at him. By threats of harm, Merzbacher forced James to beat up other students.[5] (E. 98, 115). One evening, several stu-

---

5. James testified that if he did not fondle the female students or beat up several of the male students, Merzbacher would "get" him and "hurt" him. (E. 117). Since the seventh grade, James was aware that Merzbacher had a gun in his possession, and that he would use it at any time. In fact, on one occasion, James saw Merzbacher shoot the gun at street signs as Merzbacher drove students around in his car. (E. 115).

dents stopped at Merzbacher's home after driving around with him. There, Merzbacher "raped" James, who described the incident as follows: "[Merzbacher] forced me on the bed and I said, Mr. John, what are you doing and asked him to stop. And he said, shut up, just go along with me. I said, Mr. John, don't. He said, [James] . . . just . . . shut up and take what's coming or I'll kill you." (E. 118). Merzbacher also "raped" James on the evening of his Confirmation. To ensure his silence, Merzbacher told James that "if you ever [speak] a word of this to anybody, . . . I'm going to kill you." (E.120). Merzbacher continued to terrorize and threaten James after he graduated from middle school, warning him not to "breathe a word of this to anybody. I can always get you." (E. 120). James told no one of the physical or sexual abuse because "[t]hreats were always made . . . that he could get to me any time." (E. 120). Despite his knowledge that Merzbacher's acts were "wrong," James "was afraid of Merzbacher, and I was ashamed, and I feared for my life." (E. 125–126).

## *Angela* [6]

Angela first met Merzbacher when he drove her boyfriend Bryan to meet her on a street corner. After parking at an A & P market, Merzbacher got in the back seat of the car with Angela, grabbed her hair, pulled out a gun and began to rape her. (E. 264–265). After Angela tried to jump out of the car, Merzbacher warned her that if she continued to resist him, he would "blow [her] f'ing head off," and that if she ever told anyone, he would kill her, her sister and Bryan. (E. 265). Still holding the gun, Merzbacher then forced Bryan to rape Angela. (E. 266). During the next eight months, Merzbacher raped Angela approximately thirty times either at the Catholic Community Middle School or at the Rockaway Beach Fire Department. (E. 267). Each time Merzbacher would tell Angela not to tell anyone or he would kill her family. On one occasion, Angela's mother overheard Merzbacher make inap-

---

**6.** I have deleted all references to the plaintiffs' actual surnames where they may have appeared in the deposition transcripts.

propriate comments to Angela over the telephone. Thereafter, when Angela's mother saw Angela getting into Merzbacher's car, she chased the car through the community of Essex and then called the police. After this incident, Merzbacher threw beer bottles into the swimming pool at Angela's home and continued to threaten Angela, warning her that if she reported him, "no matter when it was, how old I was or where I lived, that he would kill me and my family." (E. 269).

## Mary C.

When Mary C. was in eighth grade, Merzbacher would fondle her, lift up her skirt, pinch her breasts, and shove the stem of a smoking pipe into her vagina. (E. 328, 344). During this year, Merzbacher also raped Mary C. at the Rockaway Beach Fire Department. (E. 344). After raping her, Merzbacher pinned her hair to the floor with his foot, and forced three male students to rape her. Mary C. was aware that Merzbacher had a gun in his possession and that "he wasn't afraid to use it at that point." (E. 346). Shortly thereafter, Merzbacher approached Mary C. in the storage room of the school and began kissing her. When she resisted, he slammed her against the wall, put his hands around her throat, and told her that if she ever pulled away from him again, he "would kill her." (E. 347). Merzbacher continued to make similar threats to her approximately three to four times a week. He also threatened the safety of her father, a Baltimore City police officer, several times. On one occasion, Merzbacher pulled Mary C. out of class and asked, "[Mary C.], what's your father doing here? You're not blabbing are you? He better not get too nosey or I'll kill him." (E. 330). Holding a gun to her head, Merzbacher also warned, "Who's gun do you think could blow a bigger hole in someone's head—mine or your father's?" He added, "My gun could blow a hole so big in Johnny Law's head. . . ." (E. 330).

On another occasion, Merzbacher approached Mary C. after school and asked her if she was pregnant. When she expressed uncertainty, Merzbacher told her that she "better not be" and that, if she were, he would "shoot her." (E. 347–348).

He further threatened Mary C. by telling her that, if she were pregnant, he would "shoot [her], yank it out with a hanger and let [her] bleed to death, or he would knock [her] down the stairs." After picking up Mary C. and her date from a school dance, Merzbacher also threatened that if she ever said anything about what he had done to her, he would kill her. (E. 349). Mary C. did not report Merzbacher's conduct to the authorities because "Merzbacher and I had an agreement. If I kept my mouth shut, he wouldn't kill me. If I did certain things that he said to do, I stayed alive, and I carried that with me." (E. 351).

### *Elizabeth*

On one occasion, Merzbacher pulled out his revolver, spun the chamber, pointed it at Elizabeth's face and pulled the trigger. Although the gun did not discharge on that day, Elizabeth recalls another afternoon when Merzbacher also played "Russian Roulette" and shot a loaded gun above the heads of several students, yelling "I'll fucking kill you." (E. 459). Elizabeth also described a separate incident when Merzbacher

> "had a book, a set of fake books and he had a bottle of sherry . . ., I had never tasted alcohol before, and he gave me this sherry and then he removed my underwear and raped me while he sat on his desk chair. I was eleven, and he used that pattern repeatedly. Sometimes in that storage room was when he would also pull out his revolver and point it at my head when he raped me." (E. 462).

Merzbacher "had no qualms about pulling [the gun] out and letting you know he had it, that it was around . . . ." (E. 462).

One afternoon, Merzbacher raped Elizabeth in the storage room with the gun to her head. He shouted, "I will blow your fucking brains out if you ever tell anyone what I have done to you at any point in time. I will find you, I will come and get you." (E. 463). Merzbacher also warned Elizabeth, "I will kill your father, I will kill your family. You're a bad little girl. Who would believe you anyway? [B]ut I will fucking blow

your brains out." (E. 463). Several years after the abuse had ended, Elizabeth returned to the Catholic Community Middle School and spoke with the principal about Merzbacher. Elizabeth warned her that Merzbacher had been "brutal" to several male and female students, and that he had frequently raped her. Most importantly, Elizabeth expressed concern that Merzbacher not be allowed to continue teaching at the school. In response, the principal said, "Liz, I think you should forget it and get on with your life, people change." (E. 466).

### Mary Doe

Merzbacher fondled Mary on a daily basis, pulling up her skirt with a stick and grabbing her in her private areas. (E. 192). During a rehearsal for a school play, Merzbacher asked Mary to go to the storage room and fill up his coffee mug. Merzbacher and a male student approached Mary in the storage room from behind, and Merzbacher began fondling her. He then instructed the male student to take Mary's clothes off and get on top of her. Holding a long-bladed knife, Merzbacher told Mary that he would kill her if she did not stop screaming. Merzbacher then "took the knife and he stabbed a banjo that was next to my head and he told me that if I didn't shut up, my face would be next." (E. 193). On a separate afternoon, Merzbacher kept Mary after school, sat on top of her, unbuttoned her blouse and bit her on the breast.[7] Mary testified that "I started screaming for someone to help me, and he told me that I'd better shut up or he was going to fucking blow my brains out. And that if I didn't stop screaming he would kill my family and my dog." (E. 196). After this incident, Merzbacher reminded Mary on several occasions that "if I went to anyone with authority, that he would kill me and my family ... no matter how old I was ..." (E. 198, 205).

---

7. While Merzbacher was still on top of Mary, the principal entered the room. After warning Merzbacher that she did not want his door locked, the principal left the room. (E. 196–197). No disciplinary action was taken.

*Steven*

Steven's first encounter with Merzbacher was in the sixth grade when Merzbacher suddenly started punching Steven, throwing him against the locker and beating him up. (E. 378–379). Thereafter, Merzbacher would force Steven to engage in oral sex with him after class. (E. 380). This type of abuse continued through the year and the next two years, and would frequently occur in front of other teachers. (E. 381). Merzbacher would threaten Steven by telling him that Merzbacher had connections to the "mafia" and to other "hit men" who could get him at any time, and by showing Steven where he had shot his gun through the wall. (E. 380). More than once, Merzbacher would point the gun at Steven, telling him if "you ever tell anybody, I'll kill you. I'll kill your father, I'll kill your mother, I'll kill your whole family." (E. 381). The principal once confronted Merzbacher about his abuse of Steven before a classroom of students. In the principal's presence, Merzbacher choked Steven, pulled his tie, punched him and kicked him, and said "see, I'm not hurting him." (E. 381). After witnessing this abuse, the principal merely responded, "Oh, John, stop it." [8] According to Steven, he witnessed Merzbacher engaging in sexual intercourse with the principal. (E. 386–387). After Steven began telling other students about this incident, Merzbacher put his arms around Steven's neck and said, "I'll kill you. And don't you tell anybody.... And you're a crazy bastard." (E. 388). Even after Steven got married and moved to California, he did not report Merzbacher because "he was going to kill my father, my mother, wipe out my whole family." (E. 396).

*Bryan*

Bryan first met Merzbacher when he was returning a fireman's coat to the Rockaway Beach Fire Department. There, Bryan recalls that Merzbacher would "laugh," "cuss,"

---

8. A similar event occurred when another Sister entered Merzbacher's classroom while he was grabbing students. The Sister "gave him a look ... just like, John stop it." No further action was taken. (E. 385).

and drink beer with thirteen and fourteen year old students. (E. 299).[9] Viewing Merzbacher as "cool," Bryan moved in with him to escape physical abuse at home. While Bryan lived with Merzbacher, Merzbacher would frequently fondle Bryan and "grab me by the back of my hair and hold me down on the pool table in the firehouse." (E. 301). Merzbacher would also force Bryan to watch as he raped Bryan's girlfriend. (E. 303–304). Despite this abusive conduct, Bryan did not report Merzbacher because

"[i]f you pissed John off, he would threaten to have some thugs from South Baltimore come down and beat you to death. But his more specific threats, I mean the threats that I overheard him make and that I firmly—that I honestly did believe him, and I know John probably better than the rest of those students do. . . . [B]ut there was also a look of . . . pure . . . evil, that he would sit . . . across that table from me at dinnertime and he would be mad, and he would take a glass plate and sling it up into the air and let it bounce off a glass table that I was sitting at, and if it shattered, he was all the more happy, and he would stare at me with the cigar in his mouth and his eyes—I mean, he sat there and looked at you, and nobody could look any worse than John Merzbacher when he wanted to instill fear in you. And the night he told Mary [C.] that he would kill her, he had been drinking, and I believed every word of that, as well as the night he told me. I mean, I have no doubt in my mind that he meant it when he told me that, and he used to tell me that it wasn't a matter of wanting to kill me or whether anger would drive him to do it or betrayal, . . . . he

---

**9.** Although Bryan was not enrolled in the Catholic Community Middle School, he frequently attended Merzbacher's class. (E. 298). Bryan described how Merzbacher would "grab [students] in the crotch or push them up against the car and lean them over the hood . . ." (E. 300). On one occasion, Bryan witnessed Merzbacher walk up behind the principal and place his hands on her breasts and on her buttocks. In response, the principal simply "giggled and backed away." (E. 310). Bryan also recalls confronting another school teacher, who was a priest, when he was drinking beers with Merzbacher and other students. According to Bryan, the priest began to drink beer with Merzbacher and the young students. (E. 311).

would have to kill me to prevent himself from going to jail. And this is what he told me. And he told me this time and time again...." (E. 303–304).

One evening when Bryan and Merzbacher were sitting in Merzbacher's car, Merzbacher "pulled that hammer [of the gun] back that night to where a flip of his finger would have blew my skull apart, and he told me that if I ever said anything ... he would have to kill me." (E. 304). After Merzbacher was indicted, Bryan "had nightmares where he's after my children now, and, ... I wake up in a panic to where I don't realize that I'm still in a dream." (E. 310).[10]

### Katherine

Throughout the period when Katherine attended Merzbacher's class, Merzbacher would frequently grab her, push her against the blackboard, put his finger into her vagina, and grab her breasts, in front of the class. (E. 420). Katherine specifically described one incident where

"I was sent in there [the storage room] to wash his coffee mug out, and when I went and was washing his coffee mug out, he came in and started kissing my neck, kissing down my neck and grabbing my hair, and that's when the original threat that he said to me, you know, 'Shut your mouth, if you ever breathe a word of this to anybody no matter where you are, no matter how old you are, I will track you down and I will blow your fucking head off.' ... and I was terrified because I didn't know what next was going to happen." (E. 420).

Katherine did not report Merzbacher's conduct because "I was terrified. When you go through something like that, I mean, I

---

10. Bryan witnessed Merzbacher shoot his gun on two occasions. On the first occasion, Merzbacher shot a gun through the front windows of Chesapeake High School, shattering the windows and narrowly missing a janitor inside the school lobby. (E. 313). On a separate occasion, Merzbacher stopped his car to talk with some girls, and a van hit him from behind. When the men attempted to exit the van, Merzbacher shot five bullets into the van. After the van drove off, Merzbacher went home to get a sawed-off shot gun. After searching for hours, Merzbacher found the parked van and shot it seven times. (E. 313).

still am in terror. I still am petrified. When I lay my head down at night, I see that man's face and I have nightmares." (E. 421). Merzbacher continued to threaten Katherine even after she had graduated from middle school. Approximately twenty times, Katherine's neighbor approached her and said "Mr. John said to tell Big Momma hello, and don't ever forget." (E. 423). Soon thereafter, Merzbacher spotted Katherine crossing the street, slowed down his car and "with that evil conniving grin he has and that little chuckle stopped and stared over at me, and it petrified me. If the ground could have opened up and I could have crawled in, I would have." (E. 423).[11]

### Sharon

Merzbacher began pulling up Sharon's uniform and fondling her when she was in the sixth grade.[12] This behavior continued throughout Sharon's three years at the Catholic Community Middle School. When Sharon was in the seventh grade, Merzbacher began to smack her and pull her hair approximately once a week. (E. 67). One evening after school had ended for the summer, Merzbacher drove Sharon and a male student around in his car. Merzbacher forced Sharon to sit on the male student's lap and drink a glass of wine. He then stopped the car at "Sherri's Show Bar," and attempted to pull down Sharon's tube top. (E. 68). When Sharon struggled, Merzbacher "got in [the glove box] and he pulled a gun out and he put the gun in my face, up to my head, and he told me if I ever did that again or if I ever told anyone what we were out doing or about him touching me, he would blow my ... fucking brains out." (E. 68).

During Sharon's final year of middle school, Merzbacher began to approach her in the storage room where the coffee

---

11. Kathcrine's fear of Merzbacher escalated when she learned that he worked "for 911," and could, Katherine believed, find her wherever she was living. (E. 425).

12. Merzbacher also referred to Sharon as "Candy Bar" in front of other students and teachers. (E. 63).

machine was located.[13]   He would fondle her in her privates and rape her almost every day.  (E. 73–74).  Sharon testified that "[a]t first I would fight him.  I mean, I wanted him to stop.  I didn't want—I would try to keep my legs closed real tight, and he would just hit on me and pull my hair and smack me more and threaten to kill me if I didn't let him do what he wanted to do.  He just wouldn't stop."  (E. 73).  Merzbacher would frequently hold a gun "in [Sharon's] face and at [her] head."  (E. 72–73).  Sharon also remembers Merzbacher taking her to a firehouse where he "pulled my pants off and then he took his pants off and he started to go inside of me, and I just—I started crying so much."  (E. 75).  Prior to this meeting, Merzbacher threatened Sharon that unless she met him in the firehouse, he would shoot her boyfriend.  (E. 76).  Merzbacher also threatened Sharon when she returned after graduation to visit her former home room teacher.  During this visit, Merzbacher spotted her and "he came running out and he grabbed me and I pushed him away and I had tears in my eyes and I told him that I was no longer a student there and that he can't touch me anymore. . . .   He grabbed me by my hair and he threw me up against the lockers, and he told me, 'I can do anything I want to you at any time whenever I want,' and then he pushed me away."  (E. 78).

### Mike Doe

Merzbacher first began abusing Mike when Mike was in the sixth grade at the Catholic Community Middle School.  Merzbacher would pull Mike's hair, punch him in the arm, smack him in the head and touch him in his private areas and his buttocks.[14]   (E. 232).  This abuse continued throughout the

---

13.  As the testimony of several witnesses disclosed, it was Merzbacher's pattern to direct students to fill up or clean his coffee mug in the storage room.  After the students would enter the storage room, Merzbacher would approach them and sexually and/or physically abuse them.

14.  Mike also witnessed Merzbacher touching the breast of the principal when she entered the classroom to hand Merzbacher some papers.

seventh grade, when Mike first became aware that Merzbacher had a gun in his possession.[15] The following year, Merzbacher twice attempted to force Mike to engage in oral sex with him. The first incident occurred in front of four or five other boys, and the second incident occurred in the storage room with Merzbacher alone. (E. 234). Merzbacher then told Mike that if he ever told anyone about these incidents, no matter how old Mike was or where he was living, he would find Mike and kill him. (E. 234). Mike never reported these incidents to the authorities because "[h]e told me he would kill my father. He threatened our lives." (E. 234). Merzbacher continued to threaten Mike even after Mike graduated from middle school. At a school mate's graduation party, Merzbacher approached Mike from behind, put a gun to Mike's head and said, "Never forget, Mike. I'll blow your fucking brains out any time I want to." (E. 235).[16]

### Melody

When Melody attended the Catholic Community Middle School, she studied in an empty room across the hall from Merzbacher's classroom. (E. 512). Consequently, she frequently witnessed Merzbacher physically and sexually abusing his students. Melody specifically viewed one female student sitting on Merzbacher's lap with her underwear down to her ankles. The principal responded to Melody's concern over this incident by telling her that the student "was having a problem with the elastic in her underwear." (E. 515). Upon

According to Mike, the principal "had an embarrassed look on her face and she backed right out of the classroom." (E. 238).

15. During this year, Mike recalls seeing a bullet hole in the wall in the back of Merzbacher's classroom. (E. 234).

16. Mike further described the effect of Merzbacher's threats on his life as follows:

"This living in fear all them years, I mean unless you have been in a similar situation, you don't know what it's like to have to live in fear, to have to worry about someone killing you or killing someone else, and having something that you want to tell someone but not being able to, to have a threat on your life...." (E. 240).

learning that Melody had complained to the principal, Merz-bacher threatened her several times. For example, he told her that he would "blow [her] fucking head off" if she did not stop complaining. (E. 513). Several of Merzbacher's students also attacked Melody when she was going up the stairs and "held me around my neck so I couldn't turnaround to see them, and they threw me down on the ground and my lip was busted and my nose was busted. And they held my head down and they kept hitting me and punching—kicking me...." As the children walked away, they said that it "came from John." (E. 518). Merzbacher also approached Melody on one occasion and "held the gun right [against me] and told me if I didn't keep my mouth shut, ... I wouldn't have to worry about having my studies in the library. I'd be in my fucking coffin." (E. 519). Even years after Melody graduated, she never discussed Merzbacher with her husband because "I was too scared.... I believed that he would find me and kill my kids. I believed him. I believed that he would find me no matter where he was, what year it was. I believed him with all my heart that he would find me and kill me and my family, and I still believe that." (E. 523).

## B.

In January 1994, Merzbacher was arrested and charged with several counts of rape and sexual child abuse. Thereafter, most of the plaintiffs felt safe enough to come forward and discuss the abuse with either their families, the State's Attorney, a private attorney or the police. Until this time, however, the plaintiffs, who were repeatedly threatened at gunpoint to remain silent, still believed that their safety, and that of their families, was in jeopardy. As the testimony set forth above demonstrates, Merzbacher had repeatedly warned them that, if they reported him, he could find them "no matter where they were" and would kill them and their families. Mike Doe testified that "[u]p to [when Merzbacher was arrested,] I had been afraid because he had threatened my life and I feared for my wife and I feared for my family's lives, but when I saw him with his handcuffs on and all these other people

were coming forth and he was in jail, I felt I was safe enough to come forth. . . ." (E. 236). Mary C. testified that "I think [that Merzbacher has not threatened me since I came forward] because he is in custody. Some type of type of custody. I think if he were free to walk the streets without being observed, I think I would have been contacted." (E. 352). Melody stated: "I came forward . . . when he was in jail, when I knew he had already been locked up." (E. 523). Bryan came forward "four days after the story [about Merzbacher's arrest] was on the front page of the Sun Paper." (E. 308). Angela reported the abuse when "Merzbacher was arrested," and she "figured he was in jail." (E. 270). Katherine reported Merzbacher "after he was arrested and then I felt like there was a little bit of safety there." (E. 430).

Several plaintiffs also testified that, because of the large group of former students who came forward to report Merzbacher, there was "safety in numbers." (*E.g.*, Elizabeth's testimony at E. 472). Katherine testified that "I would have never come out by myself with this. Never." (E. 430). The State's Attorney and the police detectives also assured many of the plaintiffs of their continued safety and protection from Merzbacher if they disclosed the abuse. Elizabeth stated that "I have the protection of the State's Attorney or the police assuring me if I so much as fall up a step, Merzbacher is going to be the first person they look toward." (E. 477). And Jane Doe testified that "[the detective] assured me that I would be safe if I told him. He said, don't worry, you'll be totally safe. . . . I assumed [Merzbacher] was going to be arrested, and then I'll be safe." (E. 166).

Thus, only after Merzbacher was arrested and after the plaintiffs were assured of their safety, did they believe that they could come forward with their claims against Merzbacher. There is absolutely no evidence in the record indicating that, prior to this time, the plaintiffs did not believe that they could come forward without endangering themselves or their families. Moreover, in light of the evidence, the plaintiffs' fears were obviously not unreasonable.

II.

A.

Almost 150 years ago, this Court held that, where barring an action on the ground of limitations "would be unjust and inequitable," the defense of limitations "should not be sanctioned," *Steuart v. Carr,* 6 Gill. 430, 440 (1848).

More specifically, this Court has repeatedly taken the position that a defendant will be deemed to have waived the defense of limitations or will be estopped from relying upon the running of limitations when the defendant "asked the [plaintiffs] to forbear bringing suit against him," *Leonhart v. Atkinson,* 265 Md. 219, 228, 289 A.2d 1, 6 (1972), or when "the defendant 'held out any inducements not to file suit,'" *Booth Glass Co. v. Huntingfield Corp.,* 304 Md. 615, 624, 500 A.2d 641, 645 (1985), quoting *Nyitrai v. Bonis,* 266 Md. 295, 300, 292 A.2d 642, 645 (1972). *See also, e.g., Jordan v. Morgan, Adm'x,* 252 Md. 122, 132, 249 A.2d 124, 129–130 (1969); *Cornett v. Sandbower, Adm'r,* 235 Md. 339, 342, 201 A.2d 678, 680 (1964) (relying upon, *inter alia, Steuart v. Carr, supra,* 6 Gill at 440); *Bayshore Industries v. Ziats,* 232 Md. 167, 192 A.2d 487 (1963); *Chandlee v. Shockley,* 219 Md. 493, 495, 502– 503, 150 A.2d 438, 439, 443 (1959) (finding that the defendant, who "requested and induced" the plaintiff not to file suit, waived the defense of limitations or was estopped from defending on the ground of limitations).

When a rapist and child abuser holds a gun to his young victim's head and threatens to shoot the victim, as well as kill the members of the victim's family if the victim ever discloses the rape and abuse, the conduct of the rapist and abuser clearly amounts to an inducement not to file suit. It is more than the equivalent of "ask[ing]" the victim "to forbear bringing suit." *Leonhart v. Atkinson, supra,* 265 Md. at 228, 289 A.2d at 6. Bringing an action in court is obviously a form of disclosure, and Merzbacher's threats covered *any* disclosure. There are few, if any, inducements stronger than holding a loaded gun to a person's head. Furthermore, under the evidence set forth by the plaintiffs, the inducements were

continuing, and their effect did not end before the authorities took Merzbacher into custody. Under settled principles of Maryland law, Merzbacher waived the defense of limitations and is estopped from relying upon limitations.

The majority opinion states that treating Merzbacher's "alleged threats" as "inducements" is "a novel application of the estoppel rule in Maryland" (majority opinion at 535). This is not quite accurate.

While not discussed by the majority, this Court's opinion in *Bayshore Industries v. Ziats, supra,* 232 Md. 167, 192 A.2d 487, is very much on point. Moreover, the holding in *Bayshore Industries* requires a reversal in the present cases.[17] The issue in *Bayshore Industries* was whether the claimant, who sought compensation for work-related injuries under the Workers' Compensation Act, was barred from filing her claim by the 18–month statute of limitations set forth in that statute. After receiving the claimant's medical bill, a representative of the employer informed her that the company refused to reimburse her for her medical expenses. During the course of this conversation, the employer also warned the claimant that, if she filed a claim for workers' compensation, "you will be sorry. You will never work here again and probably no where around here any more." 232 Md. at 170, 192 A.2d at 489. For over a year, the claimant frequently inquired about the possibility of returning to work.[18] While promising to call her regarding her employment with the company, the employer continued to threaten that the claimant would not be re-called

---

**17.** In addition, the 1963 opinion in *Bayshore Industries* directly refutes the majority's assertion that "this Court first intimated in 1972 that 'unconscionable, inequitable, or fraudulent act[s] of commission or omission upon which another relie[s] and has been mislead to his [or her] injury' may equitably estop a defendant from raising limitations as a defense under a general statute of limitations." (Majority opinion at 533). In fact, the majority itself in footnote 7 of its opinion goes on to cite earlier cases standing for the same principle. The principle was recognized as early as 1848 in *Steuart v. Carr,* 6 Gill 430, 440.

**18.** Although the claimant had been laid off two days after her accident because Bayshore Industries had completed the order on which she was working, the company had allegedly promised to re-call her.

if she pursued a claim for compensation against the company. After the employer refused to re-call the claimant, she filed a claim with the Commission more than two years after the accident. The employer argued that her suit was barred by the 18–month statute of limitations. The claimant maintained that she was nonetheless entitled to compensation because her failure to file a timely claim was induced by the employer's threats. The Commission upheld her claim on the ground that the threats amounted to an estoppel. The circuit court rejected the applicability of estoppel, "but upheld her claim on the ground of duress, which it considered to amount to a kind of fraud." 232 Md. at 169–170, 192 A.2d at 489.

This Court, in unanimously affirming the claimant's judgment against Bayshore Industries, indicated that the threats amounted to duress sufficient to preclude the employer's reliance on the statute of limitations, saying (232 Md. at 174, 192 A.2d at 491):

"The threat that Bayshore would bar the appellee from future employment is similar to a threat to cause the loss of present employment. A threat of the latter type has been held in suits for personal injuries to amount to duress sufficient to avoid a release by an employee in favor of an employer. *Holmes v. Industrial Cotton Mills Co.*, 64 F.Supp. 20 (D.C.S.C.) (Present employer); *Wise v. Midtown Motors* (Minn.), [231 Minn. 46] 42 N.W.2d 404 (threat by present employer, release to former employer); *Perkins Oil Co. of Delaware v. Fitzgerald* (Ark.), [197 Ark. 14] 121 S.W.2d 877 (threat to discharge the injured employee's stepfather, then the only breadwinner in the family, and to blacklist him with other employers in a like business); and *Huddleston v. Ingersoll Co.* (Colo.), [109 Colo. 134] 123 P.2d 1016 (threat to discharge another). See also annotation, 20 A.L.R.2d 743, at 751."

The Court went on to hold that the coercion "amount[ed] to clearly inequitable conduct" and that "[t]he employer should be estopped from profiting by such conduct." 232 Md. at 174–175, 192 A.2d at 491. The employer's threats regarding future employment were viewed by the Court as constituting an

"inducement upon which the claimant relied" and " 'amounting to an estoppel.' " 232 Md. at 179, 192 A.2d at 494.

A provision of the Workers' Compensation Act applicable in the *Bayshore Industries* case, former Maryland Code (1957), Art. 101, § 39(c), did relieve a claimant of the bar of limitations if the failure to file a timely claim "was induced or occasioned by fraud, or by facts and circumstances amounting to an estoppel," 232 Md. at 169, 192 A.2d at 488. While the Court in *Bayshore Industries* did state that the claimant was entitled to relief under this statutory provision, 232 Md. at 174, 192 A.2d at 491, the Court also clearly held that the claim would not be barred by limitations under general principles of equitable estoppel and under this Court's prior decisions in cases not involving such a statutory provision, 232 Md. at 175–178, 192 A.2d at 491–494. The *Bayshore Industries* opinion relied on general principles of equitable estoppel set forth in 3 *Pomeroy's Equity Jurisprudence* (5th Ed.), §§ 802–805 (1944), as well as on numerous cases in Maryland applying those principles. *See* 232 Md. at 175–177, 192 A.2d at 492–493.

Furthermore, the Court's opinion in *Bayshore Industries* relied most heavily on *Chandlee v. Shockley, supra,* 219 Md. at 502–503, 150 A.2d at 443, where this Court held that the defendant had waived or was estopped to rely on the bar of limitations in a statutory action, even though the statute there involved contained no provision similar to former § 39(c) of the Workers' Compensation Act.[19] Chief Judge Brune for the Court in *Bayshore Industries* stated (232 Md. at 177, 192 A.2d at 493):

> "The Maryland case which is perhaps closest to the instant case insofar as estoppel to plead limitations is concerned is *Chandlee v. Shockley,* 219 Md. 493, 150 A.2d 438. In that case the plaintiff had been injured in an automobile collision

---

**19.** Judge Henderson's dissenting opinion in *Chandlee v. Shockley,* 219 Md. at 503–504, 150 A.2d at 444, would have drawn a distinction between causes of action under the Workers' Compensation Act where there was an express provision concerning estoppel, and other causes of action where there was no similar statutory provision. The majority opinion, by Judge Hammond, rejected the distinction.

in which the driver of the other car, who was the defendant's decedent, had been killed. Suit was not filed against the administratrix until more than six months after her qualification, and the administratrix demurred to the declaration on the ground of limitations under § 112 of Article 93 of the Code (1957). This Court held that the time limitation contained in that section was a limitation on the right and not merely on the remedy and hence that the defense could be raised by demurrer. This Court further held (over the dissent of two Judges) that the allegations of the amended declaration as supplemented by a bill of particulars were sufficient to estop the administratrix from asserting the defense of limitations. These allegations were, in brief, that a representative of the decedent's insurance company, who was authorized to act for the administratrix, had assured the plaintiff's counsel that if settlement efforts failed, the defense of limitations would not be pleaded. § 112 of Article 93 contained no proviso similar to that contained in § 39(c) of Article 101 of the Code (1957)—a difference which was pointed out in the dissenting opinion. The majority relied heavily upon *Scarborough v. Atlantic Coast Line R. Co.*, 178 F.2d 253 (C.A.4th.) (cert. den. 339 U.S. 919 [70 S.Ct. 621, 94 L.Ed. 1343]), in which the filing of suit under the Federal Employers' Liability Act was delayed beyond the statutory period because of erroneous information given by a railroad claim agent as to the time within which suit could be brought. This Court quoted from *Scarborough* a passage containing this statement: 'The ancient maxim that no one should profit by his own conscious wrong is too deeply imbedded in the framework of our law to be set aside by a legalistic distinction between the closely related types of statutes of limitations.' That ancient maxim is also recognized as the law of this State...."

Consequently, the general equitable principle that " 'no one should profit by his own conscious wrong,' " *Chandlee v. Shockley, supra,* 219 Md. at 500, 150 A.2d at 442, and the principle that a defendant, who induces the plaintiff not to file suit, has waived or is estopped from relying upon the bar of

limitations, were applied by this Court in *Bayshore Industries* to threats and coercion. Moreover, the employer's threats in *Bayshore Industries* pale in comparison to Merzbacher's threats in the present cases.

B.

The majority opinion at one point appears to accept the principle that "a potential tort plaintiff can as much be induced to delay his or her action by an affirmative threat, as he or she can by a false promise" (majority opinion at 535), and that, in this situation, a defendant may be estopped from relying upon the bar of limitations. Later, however, the majority refuses to apply this principle to the present cases "for several reasons." The "[f]irst and foremost" reason is that, as a matter of law, "no jury could find that Appellants acted within a reasonable period of time following the cessation of Merzbacher's conduct." (Majority opinion at 542). The majority continues by concluding that "unsubstantiated fear of retaliation is not" a "valid excuse for not commencing suit within the three year general limitations period" (*ibid.*).

The majority's description of the plaintiffs' fear of retaliation as "unsubstantiated" is utterly amazing. Every single one of the plaintiffs were threatened with death by Merzbacher. He also threatened to kill their families. The threats were "substantiated" by holding a gun to their heads, by shooting guns in their presence, by shooting a gun over their heads, by physical abuse, by a knife, and by bringing someone to tell the students that Merzbacher had killed a girl's father because the girl had complained about Merzbacher. I do not know how Merzbacher's threats could be more "substantiated" unless he had carried them out and killed one or more of the plaintiffs.

The majority's view that the plaintiffs acted unreasonably, as a matter of law, when they failed to come forward before limitations had run, and thus before Merzbacher was apprehended, shows an incomprehensible disregard for the coercive effect of holding a loaded gun to a person's head, and particu-

larly to a child's head. I simply cannot fathom the majority's lack of appreciation for the fear that conduct such as Merzbacher's could reasonably instill in young rape and sexual abuse victims. While the majority states that "no jury could find that" the plaintiffs acted within a reasonable period of time, I doubt that many rational jurors would find otherwise.

The majority emphasizes that Merzbacher's conduct towards these plaintiffs ceased long before limitations had run (majority opinion at 542). Although the majority's reliance on such a factor might be warranted under entirely different circumstances, the majority's view totally ignores the nature and reality of the threats in these cases. The threats, and the heinous conduct backing them up, were deliberately calculated to have, and reasonably did have, effects into the indefinite future. Allowing the defendant Merzbacher to successfully take the position that the victims should have come forward before limitations expired, when it was Merzbacher who repeatedly emphasized, at the point of a gun, that "if you *ever* tell anybody about this, I'll kill you and I'll kill your whole fucking family in a blink of an eye" (E. 156, emphasis added), is shockingly unfair.

While purporting to recognize that one may be estopped from relying on limitations, the majority's final reason for not applying the principle in these cases is as follows (majority opinion at 542–543):

> "[A] statute of limitations is nothing more than a legislative judgment about the amount of time needed to initiate a suit.... Appellants implore this Court to ignore that judgment and substitute its own. Recognizing the peculiar difficulties visited upon those of tender years who are injured in their minority, our Legislature has already determined the amount of time reasonably needed to bring an action after reaching the age of majority. We cannot disturb that determination."

This statement makes the majority's recognition of the estoppel principle completely illusory. If a reasonable time after the defendant's tortious conduct for bringing suit is always the

time period set forth in the statute of limitations, a defendant could never be estopped from relying on limitations. Under the majority's view, in every case where the plaintiff filed suit after limitations had run, the plaintiff would have waited an unreasonable length of time based on the legislative judgment. The majority's theory cannot be reconciled with decisions such as *Bayshore Industries v. Ziats, supra,* 232 Md. 167, 192 A.2d 487; *Chandlee v. Shockley, supra,* 219 Md. 493, 150 A.2d 438; and *Steuart v. Carr, supra,* 6 Gill at 440.

The flaw in the majority's reasoning is that an estoppel to rely upon a legal principle does not contradict or infringe upon that legal principle. Otherwise, there would be no concept of equitable estoppel. To hold that a defendant, because of his own conduct, may not take advantage of a particular legal proposition, including a statute of limitations, does not subvert or contradict that legal proposition. The particular law remains the same; the defendant, because of his conduct, simply is not allowed to take advantage of the law. Merzbacher should not be allowed to take advantage of his successful threats in these cases.

## C.

Not only is the plaintiffs' position in the present cases supported by the principles set forth in this Court's prior opinions, but the plaintiffs' position is supported by decisions elsewhere applying estoppel and/or duress to bar a defendant, accused of sexual abuse, from raising limitations as a defense. These decisions involve far less egregious facts than those presented in the cases at bar.[20]

For example, the Supreme Court of California applied the doctrine of equitable estoppel in *John R. v. Oakland Unified School Dist.,* 48 Cal.3d 438, 256 Cal.Rptr. 766, 769 P.2d 948 (1989). In *John R.,* a fourteen-year-old student was molested

---

**20.** Two of the cases discussed below involve the application of estoppel to bar only the perpetrator's *employer* from raising limitations as an affirmative defense. Nonetheless, the rationales used by these courts are equally persuasive in the present cases against Merzbacher.

by his mathematics teacher while he was at the teacher's apartment participating in an extracurricular program. The program had been authorized by the school district. Over the course of several sessions . at the teacher's apartment, the teacher began to seduce John by convincing him that engaging in sexual acts would be a "constructive part of their relationship." 48 Cal.3d at 442, 256 Cal.Rptr. at 767, 769 P.2d at 949. The teacher also threatened to give John poor grades if he did not cooperate. On one occasion, the teacher convinced John to engage in oral sex and anal intercourse. When John informed his teacher that he was going tell his parents about the sexual abuse, the teacher threatened to retaliate. As a result of these threats and of his embarrassment, John did not disclose his teacher's conduct to the authorities for a substantial period of time. When he did disclose the conduct, John's parents brought an untimely action on their own behalf and on behalf of John against the teacher and the school district. The trial court entered judgment for the school district on the ground that the suit was not timely filed.[21] After an initial appeal to an intermediate appellate court, the Supreme Court of California remanded the case to the trial court "for a factual determination on the applicability of equitable estoppel." The court reasoned as follows (48 Cal.3d at 444–445, 256 Cal.Rptr. at 769–770, 769 P.2d at 951–952) (emphasis in original):

> "[U]nder the reasoning of a number of recent Court of Appeal decisions ..., the facts alleged in the complaint, if proven, might well demonstrate that the claim was timely filed under a theory of equitable estoppel....
>
> \* \* \* \* \* \*
>
> "Estoppel most commonly results from misleading statements about the need for or advisability of a claim; actual fraud or the intent to mislead is not essential.... A fortiori, estoppel may certainly be invoked when there are acts of *violence* or *intimidation* that are *intended* to pre-

---

21. Because the charges against the teacher were dismissed by the plaintiffs at the trial level, the court limited its discussion to the applicability of equitable estoppel against the school district.

vent the filing of a claim. [Citations omitted]. And here, the teacher's threats to retaliate against John if the boy reported the incidents of sexual molestation allegedly did just that.

"Although the teacher's alleged threats in this case were no doubt motivated largely by self-interest, rather than to prevent John from filing a claim against the district, it would clearly be inconsistent with the equitable underpinnings of the estoppel doctrine to permit the district to benefit by such threats.... [W]e have no hesitation in concluding that the teacher's threats may be taken into account in resolving the procedural status of plaintiff's claims against the district."

A New York court adopted a similar position in *Anonymous v. Anonymous*, 584 N.Y.S.2d 713, 154 Misc.2d 46 (1992). There, the plaintiff alleged that she was sexually abused by her best friend's father from the time she was four years old until she turned twenty four. The plaintiff testified that the defendant "would tell her that he was doing these 'things' for her benefit and that she should not tell anyone else because it was their secret." 584 N.Y.S.2d at 718, 154 Misc.2d at 49. The defendant's behavior threatened and frightened the plaintiff, causing her not to reveal the acts in question until 1991, four years after the abuse ended. The defendant claimed that limitations should bar the plaintiff's suit. The plaintiff argued that equitable estoppel should preclude the defendant's reliance on limitations because, "by virtue of ... statements made by defendant, ... that he was doing this for her own good or that it was their secret[,] ... she was under duress and felt threatened and coerced and was disabled from and unable to commence the action in a timely fashion." 584 N.Y.S.2d at 722, 154 Misc.2d at 56. The court concluded that the fact finder should be given the opportunity to consider whether equitable estoppel should bar the defendant from raising limitations as a defense. 584 N.Y.S.2d at 722–723, 154 Misc.2d at 56–57.

In *Jones v. Jones*, 242 N.J.Super. 195, 576 A.2d 316 (1990), the plaintiff brought suit against her parents on behalf of

herself and her fourteen year old daughter, alleging that her father—with her mother's knowledge—had sexually abused her for several years, beginning when she was eleven years old. The plaintiff also alleged that her daughter, who had developed several medical problems, was a product of the incestuous relationship. According to the plaintiff, her father forced her to engage in sexual intercourse approximately once a week and threatened to kill her if she reported him. To reinforce these threats, the plaintiff's father regularly beat her and attempted to suffocate her on several occasions. Consequently, the plaintiff "lived in terror" of her father, and continued to have nightmares and wake up "sweating and shaking" for fear that her father was "coming after [her]." 242 N.J.Super. at 199, 576 A.2d at 318. The defendants moved for summary judgment on the ground that the statute of limitations had run. In response, the plaintiff argued that her father's coercive acts and threats placed her under duress, which prevented her from timely filing suit. The court stated: "We are ... of the view that, within certain limits, a prospective defendant's coercive acts and threats may rise to such a level of duress as to deprive the plaintiff of his freedom of will and thereby toll the statute of limitations." 242 N.J.Super. at 208, 576 A.2d at 322. The New Jersey court concluded that "we are convinced that plaintiff's submissions raised unresolved factual issues which can be decided only by way of a plenary hearing." 242 N.J.Super. at 209, 576 A.2d at 323.

Most recently, the California Court of Appeals considered whether a child abuser should benefit from the statute of limitations in *Christopher P. v. Mojave Unified School Dist.,* 19 Cal.App.4th 165, 23 Cal.Rptr.2d 353 (1993). There, Christopher, an 11–year–old boy, was sexually molested by a teacher employed by the defendant, Mojave Unified School District, during a school field trip. After molesting Christopher, the teacher told him "not to tell anyone." As a result of the teacher's statement, and the way in which the teacher said it, Christopher was "afraid of what [the teacher] might do to [him]." 19 Cal.App.4th at 168, 23 Cal.Rptr.2d at 355. He continued to fear that his teacher would physically harm him,

even after all contact between the two ended. Consequently, Christopher did not report the incident until the police began investigating another sexual abuse complaint filed against the teacher. Thereafter, the teacher pled guilty to a separate sexual molestation charge. After the teacher was sentenced, Christopher's father retained counsel on his son's behalf, and Christopher's attorney sought to file an untimely claim under the state Tort Claims Act. The trial court upheld the defendant's reliance upon limitations, but the California Court of Appeal reversed, explaining as follows (19 Cal.App.4th at 173, 23 Cal.Rptr.2d at 359):

"Several circumstances are particularly important in this case. First, the directive not to tell was made by a teacher, a recognized authority figure, to an 11–year–old student. Students generally are expected to follow their teacher's directives. Second, the statement was made in conjunction with a sexual molestation. A common trait of 'child sexual abuse accommodation syndrome' is the child's failure to report, or delay in reporting the abuse. The very nature of the underlying tort deters the molested child from reporting the abuse. [Citations omitted]. Thus, a molestation coupled with a directive not to report the incident may well deter a child from promptly reporting the abuse and thereby protecting his or her right to redress under the Tort Claims Act. . . .

"Accordingly, we conclude the circumstances presented by this case, if established, are sufficient to support an estoppel. A directive by an authority figure to a child not to tell anyone of the molestation is a sufficient inducement of delay to invoke an estoppel. Whether the District is estopped from asserting as a defense appellant's failure to comply with the claims statutes presents a question of fact for the trial court."

## D.

The public policies underlying statutes of limitations similarly do not support the majority's position under the circumstances presented in these cases. For example, the primary

policy underlying these statutes is "fairness to the defendant—providing assurance that no ancient obligations remain, and relieving him of defending against a claim after 'evidence has been lost, memories have faded, and witnesses have disappeared.'" *Harig v. Johns–Manville Products*, 284 Md. 70, 76, 394 A.2d 299, 302 (1978). *See, e.g., Doe v. Maskell*, 342 Md. 684, 689–690, 679 A.2d 1087, 1089–1090 (1996); *Hecht v. Resolution Trust*, 333 Md. 324, 332–333, 635 A.2d 394, 398–399 (1994); *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983); *Bertonazzi v. Hillman, Adm'x*, 241 Md. 361, 367, 216 A.2d 723, 726 (1966). Statutes of limitation were also created to encourage plaintiffs to exercise reasonable diligence in pursuing their claims. *Pierce v. Johns–Manville Sales Corp., supra*, 296 Md. at 665, 464 A.2d at 1026.

These concerns underlying statutes of limitations, however, are not present in the cases at bar. In these cases, where the allegations involve repetitive and extreme acts of physical and sexual abuse, it is highly unlikely that "memories have faded." Indeed, the deposition testimony of the twelve available plaintiffs reveals the detail and clarity with which the plaintiffs still recall the abuse inflicted upon them by Merzbacher. Moreover, the plaintiffs still suffer the effects of Merzbacher's conduct. According to their deposition testimony, most of the plaintiffs still seek counseling to deal with the abuse; many of them have had and will continue to have nightmares about Merzbacher, and several of them have had and will continue to have marital and/or alcohol and drug related problems. Thus, there is no real concern that the plaintiffs' claims are either fraudulent or stale. Similarly, it would hardly be "unfair" to preclude Merzbacher, who made the threats, from taking advantage of the very threats and coercion that caused the plaintiffs to delay their suits. As discussed earlier, the evidence shows that the reason that the plaintiffs failed to file suit in a timely manner was the extreme threats of physical harm to them and to their families. Once Merzbacher was arrested and the plaintiffs were assured of their safety, they

reported the abuse and filed timely claims against Merzbacher.

The majority opinion states that the inapplicability to the present circumstances of the public policies underlying statutes of limitations "is quite beside the point." (Majority opinion at 543). The majority goes on to indicate that not applying the statute of limitations amounts to "rewrit[ing] a legislative enactment" and that such "function belongs solely to the General Assembly." Such rigidity with regard to the application of statutes of limitations is not consistent with the previously discussed opinions of this Court declining to apply statutes of limitations because of the defendant's conduct. It is not consistent with this Court's opinions adopting the discovery rule. *See, e.g., Pierce v. Johns–Manville Sales Corp., supra,* 296 Md. at 664–669, 464 A.2d at 1025–1028 (relying on the public policies underlying statutes of limitations in holding that the plaintiff's claim was not time barred); *Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677, 680 (1981) (adopting the discovery rule generally "to prevent an injustice in other types of cases"); *Sears, Roebuck & Co. v. Ulman,* 287 Md. 397, 401, 412 A.2d 1240, 1242 (1980) ("fairness to a plaintiff who has not slept on his rights justifies exceptions to [the] general rule"); *Harig v. Johns–Manville Products, supra,* 284 Md. at 80, 394 A.2d at 305 ("[a]voiding possible injustice in such cases outweighs the desire for repose and administrative expediency, which are the primary underpinnings of the limitations statute").

### E.

To reiterate, this Court has long held that a defendant's reliance on the running of limitations "should not be sanctioned by a Court" where it "would be unjust and inequitable." *Steuart v. Carr, supra,* 6 Gill at 440. The Court has applied " '[t]he ancient maxim that no one should profit by his own conscious wrong' " to preclude defendants from relying on the bar of limitations. *Bayshore Industries v. Ziats, supra,* 232 Md. at 177, 192 A.2d at 493, *Chandlee v. Shockley, supra,* 219 Md. at 500, 150 A.2d at 442.

A more appropriate case than the present ones for applying these principles could hardly be imagined. The repeated heinous conduct by the defendant Merzbacher, coupled with the threats at gunpoint to the victims' lives and the lives of their families, is virtually unprecedented in any civil case heretofore coming before this Court. Merzbacher's threats were successful until he was apprehended by the authorities. To allow Merzbacher to profit from his successful egregious criminal conduct is outrageous.[22]

Finally, the majority's decision clashes with the concern for victims' rights which is a major tenet of Maryland public policy.[23] Society totally failed to protect these schoolchildren from repeated rapes, sexual abuse, other physical and mental abuse, and from being terrorized at gunpoint by Merzbacher. When the authorities finally began investigating Merzbacher, and apprehended him, thereby allowing the victims safely to disclose what had happened, the victims are told that it is too late. Merzbacher will benefit from the success of his terrorism campaign, and the victims are made to suffer all over again. Society, which failed to protect the victims initially, refuses to permit them to seek compensation from Merzbacher and rewards him for the success of his criminal coercion. I dissent.

---

**22.** As the majority opinion indicates, the trial court's grant of summary judgment in these cases, including the ground underlying that grant, was equally applicable to Merzbacher and the Archdiocese. For purposes of the summary judgment, the court drew no distinction between the two defendants. Consistent with the settled principle of Maryland procedure "that an appellate court will ordinarily limit its review of the granting of summary judgment to those grounds relied upon by the trial court," *IA Const. Corp. v. Carney*, 341 Md. 703, 708 n. 4, 672 A.2d 650, 653 n. 4 (1996), and cases there cited, the majority draws no distinction between Merzbacher's reliance on limitations and the Archdiocese's reliance on limitations. The majority holds that, because the claims are barred against Merzbacher, they "are likewise barred against the Archdiocese" (majority opinion at 543). Consequently, I shall not discuss any possible difference between Merzbacher and the Archdiocese with respect to the bar of limitations.

**23.** *See, e.g.,* Article 47 of the Maryland Declaration of Rights.

RAKER, J., concurs with the views expressed herein and joins this opinion.